```
 1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
 2                   NO. 08-0046 JB/RLP
 3
     JUAN MATA,
 4
                Plaintiff,
 5
          vs.
 6
     SGT. RON ANDERSON,
 7
                Defendant.
 8
 9
10
11
             VIDEOTAPED DEPOSITION OF JUAN MATA
12                      VOLUME 2
13           Wednesday, July 8th, 2009
                      9:20 a.m.
14   MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
         500 Fourth Street, Northwest, Suite 600
15            Albuquerque, New Mexico   87102
16
17
18        PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:
19
20   TAKEN BY:      MS. ERIN E. LANGENWALTER
                    ATTORNEY FOR THE DEFENDANT
21
22
     REPORTED BY:   MICHELE M. TRUJILLO, CCR No. 226
23                  RUSSIN WILLIAMS REPORTING
                    1608 Fifth Street, Northwest
24                  Albuquerque, New Mexico   87102
25
```



DEFENDANT'S EXHIBIT A

```
 1     A.   Yes.
 2     Q.   And that lawsuit had 34 separate counts
 3  against the officers and the City of Farmington,
 4  correct?
 5     A.   I --
 6     Q.   It was a pretty long complaint, right?
 7     A.   To what I can recall, yes.
 8     Q.   Lots of allegations against the officers
 9  and the police department?
10     A.   Yes.
11     Q.   But none of the allegations were against
12  Sergeant Anderson?
13     A.   I don't believe so.
14     Q.   And those -- that lawsuit sought damages
15  for your personal injuries, right?
16     A.   I believe so.
17     Q.   You guys alleged that you had suffered some
18  personal injuries during the arrest?
19     A.   Yes.
20     Q.   And you were trying to get some
21  compensation for your medical injuries and any
22  distress that you were under?
23     A.   I believe so.
24     Q.   And that lawsuit settled in November of
25  2005?
```

```
 1      A.    I believe so.
 2      Q.    Well, you were a part of that settlement,
 3   correct?
 4      A.    Yes.
 5      Q.    And you had to sign off on that?
 6      A.    Yes.
 7      Q.    How much was the settlement for?
 8           MR. MONTOYA:  Objection.  I believe that
 9   settlement is subject to a confidentiality provision,
10   unless you can waive it on behalf of the City.
11           MS. LANGENWALTER:  I'm not even going to
12   get into that.  I mean, the City has Sunshine Laws
13   that it's subject to, so --
14           MR. MONTOYA:  Yes, you can get it with a
15   Freedom of --
16           MS. LANGENWALTER:  So I don't think we need
17   to --
18           MR. MONTOYA:  -- with a New Mexico
19   Inspection of Public Records Act.  But I don't know
20   that we are free to discuss it.
21           MS. LANGENWALTER:  Fair enough.
22      Q.    You were paid some money, correct?
23      A.    Yes, ma'am.
24      Q.    You got some money from that lawsuit?
25      A.    Yes, ma'am.
```

```
 1        Q.   And in exchange, you signed a piece of
 2   paper, releasing your claims against the City and
 3   against the officers, correct?
 4        A.   I believe so.
 5        Q.   And part of that release is that you had to
 6   sign it, saying that you understood the release and
 7   that you were releasing those claims, correct?
 8        A.   Yes.
 9        Q.   And part of the release is that you
10   released not only those claims, but any claims that
11   you had up until that time, correct?
12        A.   I believe so.
13        Q.   Did the settlement apply to your mother, as
14   well?
15        A.   Yes, ma'am.
16        Q.   And she signed it?
17        A.   I would think so.
18        Q.   What about your brother, Rene Barraza?
19        A.   I would think so, too.
20        Q.   They were also involved in the settlement?
21        A.   Yes.
22        Q.   And so their claims against the City and
23   the officers would also be released, correct?
24             MR. MONTOYA:  Objection, calls for a legal
25   conclusion.  You may respond.
```

```
 1      A.    Up until that point, yeah.
 2      Q.    They agreed to the same things you did,
 3 right?
 4      A.    Yeah.
 5            MS. LANGENWALTER:  Actually, we're going to
 6 start a new subject, a new item here.  I've gotten a
 7 note that we need to switch tapes, when appropriate,
 8 so I think this would be an appropriate time.
 9            MR. STEVENS:  All right.  This will
10 conclude Tape 1.  The time is 10:51.  Thanks.
11            (Recess taken from 10:51 a.m. to 10:53 a.m.)
12            MR. STEVENS:  This begins Tape 2.  We're
13 back on the record.  The time now is 10:53.
14      Q.    All right.  I'm going to hand you what
15 we'll mark as Exhibit 4, which is the letter on
16 Mr. Adamson's letterhead here.
17            (Mata Exhibit 4 marked.)
18      Q.    Is this the letter that you referred to
19 when you were talking about your free speech?
20      A.    Yes, ma'am.
21      Q.    Did you write this letter?
22      A.    No, ma'am, I didn't.
23      Q.    When did you learn that it had been
24 written?
25      A.    I believe, like, a few days after it was
```

```
 1            MR. MONTOYA:  Okay with me.
 2            MS. LANGENWALTER:  All right.  Let's go off
 3   the record.
 4            MR. STEVENS:  The time is 11:19.
 5            (Recess taken from 11:19 a.m. to 11:32 a.m.)
 6            MR. STEVENS:  We're back on the record.
 7   The time now is 11:32.
 8       Q.   Exhibit 4, the letter from Ron Adamson, did
 9   you authorize Mr. Adamson to write that?
10       A.   I wasn't even aware he had -- so it was
11   already sent off to them.
12       Q.   So you didn't authorize him to write it?
13       A.   No.
14       Q.   When did you find out about the criminal
15   libel charge?
16       A.   I believe, on the 1st of January or
17   something.  I got a letter in the mail.
18       Q.   And that's how you found out?  That was the
19   first you heard of it; you got a letter?
20       A.   Yes.
21       Q.   No officer showed up at your house to
22   present it to you?
23       A.   No.
24       Q.   You weren't arrested?
25       A.   No.
```

```
 1      Q.   You weren't handcuffed or put in a car?
 2      A.   No.
 3      Q.   You just got a letter in the mail?
 4      A.   Yes, ma'am.
 5      Q.   What did the letter say?
 6      A.   I can't remember exactly, other than I had
 7 to be in court on the 10th, I believe, at 8:00 in the
 8 morning, that there was criminal charges against me
 9 for criminal libel.
10      Q.   The 10th of January?
11      A.   I believe so.
12      Q.   And until your court date, you were free to
13 go about your business?
14      A.   That's the way I took it.
15      Q.   Yeah.  You didn't have to report to the
16 police station or stay in your house or anything like
17 that?
18      A.   No.
19      Q.   Just life as normal until you went to
20 court?
21      A.   Ten days.
22      Q.   Ten days?
23      A.   (Witness nods.)
24      Q.   When you went to court, were you arrested
25 then?
```

1      A.   No.

2      Q.   Were you handcuffed?

3      A.   No.

4      Q.   Were you free to sit with your attorney and
5  participate in the proceedings?

6      A.   Actually, on that date, they showed us a
7  video, saying that there was charges, in general, to
8  everybody in the room, saying there was charges
9  pending against them; I believe, advising, like,
10 everyone in the room not to leave the county or go to
11 any establishment that sells liquor, anything like
12 that, because that could complicate matters and the
13 matter that you were there for.

14     Q.   So, other than being told that you
15 shouldn't leave the county and that you shouldn't go
16 to places with liquor, what other restrictions did
17 you have?

18     A.   There was -- I can't remember exactly.
19 There's an outline of them, like -- I don't remember
20 exactly what they were.

21     Q.   Okay.

22     A.   No negative -- I know one of them was no
23 negative contact with police.

24     Q.   Okay.  Now, were those suggestions on how
25 to behave so that it didn't turn into something

1  more?
2      A.   They might have been.  Like I said, it --
3  the video, you know, advised you to get an attorney,
4  if you didn't already have one, and --
5      Q.   So that first time that you went to court
6  was just a general meeting with a bunch of people?
7      A.   Well, no, I guess the -- after the video,
8  the judge called us one by one up there.
9      Q.   What happened when you went up there?
10     A.   He read me the charges that were pending
11 against me, and that's pretty much it, I believe.
12     Q.   Were you arrested at that point?
13     A.   No.
14     Q.   Were you taken into custody?
15     A.   No.
16     Q.   Did you get handcuffs put on you?
17     A.   No.
18     Q.   Were you free to leave?
19     A.   After the court.
20     Q.   Uh-huh.
21     A.   Yes.
22     Q.   You were free to leave?  And did the judge
23 tell you anything, any restrictions that you weren't
24 allowed to do?
25     A.   I don't recall.  I can't remember.

1          I think he said that I'd have to go back
2   again if they sent me a notice; or I don't know if
3   they set a date right there, when I'd have to go
4   back.
5        Q.   But between the time that you were before
6   the judge and whatever your next court date was, you
7   were free to leave and go about your business?
8        A.   Yes.
9        Q.   How many times did you go to court?
10       A.   I can't remember exactly, but I -- I can't
11  remember.
12       Q.   Were you ever held at the court or in jail
13  for those charges?
14       A.   No.
15       Q.   Let's look at page five of the Second
16  Amended Complaint, Exhibit 2, the very last
17  paragraph, 31, and that states that, "Although
18  Plaintiff was initially convicted of all counts in
19  magistrate court, which is presided over by a
20  non-attorney judge, the proceedings in that court
21  routinely" -- "suffer routinely and suffered in this
22  case from various procedural irregularities."
23            Is that right?  What irregularities
24  occurred in your case?
25       A.   Once again, I'm not an attorney.  You'd

```
 1        Q.   And then you were acquitted of the charges,
 2   when you appealed the decision, right?
 3        A.   Before being acquitted, the judge threw one
 4   of the charges out, the criminal libel.
 5        Q.   Okay.
 6        A.   And I had to go to trial for the other two,
 7   and that was for the ones I got acquitted on.
 8        Q.   So you had an opportunity to present your
 9   case and then to appeal it, right?
10        A.   Yes.
11        Q.   And then, ultimately, you were acquitted?
12        A.   Yes.
13        Q.   During any of that time, did you spend any
14   time in jail for those charges?
15        A.   No.
16        Q.   Were you prohibited from going about your
17   business in any way?
18        A.   Yes.
19        Q.   How?
20        A.   The restrictions that were set up by the
21   courts.
22        Q.   What restrictions were those?
23        A.   No negative contact with police and not
24   leaving the county.
25        Q.   Did you have plans to leave the county and
```

```
 1   conduct committed with actual malice and disregard
 2   for the truth," I -- all I done was sign a petition,
 3   picketed.  My nephew videotaped the incident.  I gave
 4   Ron Adamson the videotape, and, I mean, why would
 5   charges need to come about, if all I had done -- if I
 6   didn't do nothing wrong?
 7        Q.   So you think it's false that there were
 8   several prior and subsequent incidents?  Is that
 9   correct?
10        A.   No, I'm not saying that.  What I'm saying
11   is, like, why would charges need to come about if
12   I -- what I've done wasn't -- I didn't commit no
13   offense.
14        Q.   Would you agree that there were several
15   prior and subsequent incidents in -- which you
16   committed with actual malice against Officer Briseno?
17             You don't like Officer Briseno, do you?
18        A.   I don't know the man.
19        Q.   Well, you don't know him.
20        A.   I've never spoke to him, talked to him or
21   anything.
22        Q.   But you -- have you accused him of being a
23   dirty cop?
24        A.   By the things he does, yeah.
25        Q.   Okay.  And you've said that he's a liar?
```

1    A.   I never said that exactly.  These were on
2 the picketing signs that were made by, like I said,
3 different people in the community.
4    Q.   And you were holding those signs.
5    A.   I was holding a sign.  I don't know which
6 one specifically.
7    Q.   Did you pick a sign based on what you
8 personally believed about Officer Briseno, or did you
9 just pick one up?
10   A.   I picked one up.
11   Q.   And those signs included statements that he
12 was a dirty cop and a liar, right?
13   A.   I'm pretty sure.  There -- I rotated signs.
14 There was -- like I said, there was a bunch of them,
15 and I would pick one up, throw it down, pick another
16 one up.
17   Q.   And you testified in your deposition in
18 November, or in 2005, that you made a number of
19 videos of Officer Briseno, right?
20   A.   Yes, ma'am.
21   Q.   Including one that you made when you were
22 driving?
23   A.   I didn't make it.
24   Q.   Who made it?
25   A.   My nephew.