IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JUAN MATA,

      Plaintiff,

vs.                                                   No. CIV 08-00046 JB/RLP

SGT. RON ANDERSON,

      Defendant.

## AFFIDAVIT OF BRANDON CUMMINGS

STATE OF NEW MEXICO     )
                                     ) ss.
COUNTY OF BERNALILLO     )

      BRANDON CUMMINGS, being first duly sworn, and upon his oath, deposes and states:

1. I am competent to make all of the statements contained in this affidavit.

2. All of the statements contained in this affidavit are based upon my own, firsthand knowledge.

3. Sometime in 2004, I was asked by Ronald R. Adamson to review a videotape of a police car following Juan Mata's vehicle.

4. The police car followed Juan Mata's vehicle so closely that the headlights of the police vehicle disappeared, which indicated that it was extremely close to Mr. Mata's vehicle.

5. Juan Mata's minor children were in the vehicle.

6. The videotape clearly showed the speedometer of Juan Mata's vehicle several times. At no time did it show Juan Mata's vehicle traveling in excess of the posted limit.

7. Mr. Adamson and I spoke at length about the proper response to the activity in the videotape.

8. He proposed that we write a letter to the police requesting an investigation into the crimes that were obvious from the tape.

9. As I have previously testified, I offered to draft the letter. .

10. I drafted a letter enumerating the criminal counts Mr. Adamson and I believed occurred in the tape.

11. Mr. Adamson reviewed the letter, signed it and sent it to the Farmington Police Dept.

12. In the letter, Mr. Adamson noted that he was counsel of record for Juan Mata on at least one case.

13. Nowhere in the letter did Mr. Adamson claim that he was sending the letter at Mr. Mata's request.

14. On the contrary, as I have previously testified, Mr. Adamson and I decided to send the letter, identified the crimes that we thought were committed and did send it to the police department.

15. Neither Ronald R. Adamson nor I ever discussed sending the letter or asked permission to send the letter or even sought any input about the letter from Juan Mata.

16. To my knowledge, Mr. Mata had no knowledge of the letter until after it was sent.

17. The letter requested that the police department investigate the actions of Mike Briseno and Kent O'Donnell, whom Mr. Adamson and I believed to be in the vehicle.

18. The spotlight on the cruiser was, in my opinion, blinding, and the actions engaged in by whomever was driving the vehicle put all of the occupants therein in severe danger.

19. Mr. Adamson and I believed that the vehicle was the police cruiser assigned to Mike Briseno.

20. I assumed that either the driver or the front seat passenger in Mr. Briseno's cruiser was

Mr. Briseno as did, I believe, Mr. Adamson.

21. Both of us were aware of Mike Briseno's pattern of harassment toward Mr. Mata, which included: following him while he drove, driving by his home numerous times per day, parking in visual sight of Mr. Mata's house for hours on end and making unsubstantiated claims to enter upon Juan Mata's property.

22. I was personally present on at least two occasions to observe Mr. Briseno's habit of driving by Plaintiff's house numerous times during my work on the Mitchell v. Briseno, et al., case.

23. The Farmington Police Department later informed both Mr. Adamson, while I was present and listening to the phone call, that in fact Mr. Briseno's assigned cruiser was being operated by someone else because "Briseno was out of state on vacation" or words to similar effect.

24. We were told that Kent O'Donnell and David Griego were in the vehicle.

25. To my knowledge, the internal investigation claimed that the police cruiser was not tailgating Juan Mata and the spotlight was never turned on, despite the fact that the opposite was clearly seen in the videotape.

26. I have, as stated previously, testified as to the origin of the letter in question. To date, no criminal charges have been filed against me or, to my knowledge, Ronald R. Adamson.

27. I stand by the veracity of everything included in that letter with the exception of identifying officer Mike Briseno as being in the cruiser.

28. I take the Farmington Police Department at its word that Mr. Briseno was not the officer operating the unit on that day.

29. At some point in my interactions with Juan Mata, I was made aware by Juan Mata that

Maritza Torres had been contacted by Mike Briseno.

30. I was specifically informed that Maritza Torres may be working for Mike Briseno as a "confidential informant."

31. The issue of Mike Briseno using undocumented "confidential informants" contrary to Farmington Police Department or Region II Narcotics Task Force policy was at issue in the Mitchell v. Briseno case.

32. I made the attorney in that case aware of the fact that Mr. Briseno might have a pattern of engaging in this activity.

33. I do not remember if he or the attorney for Rene Mata in the prior civil rights case asked me to see what I could find out, but I do remember being asked.

34. Juan Mata or his brother provided me with contact information for Maritza Torres. The contact information provided was wrong or outdated.

35. I was subsequently able to make contact with Maritza Torres through a third party.

36. Maritza Torres advised me, in person, that Mike Briseno had told her that if she made certain statements he would help her "get her kids back."

37. She further advised me that Mike Briseno had given her money.

38. I deliberately did not ask her what the money was for—I was concerned that if I did I might find myself in the middle of a criminal investigation, given my knowledge of Mr. Briseno's use of "confidential informants" without following procedure or documenting the identity of those informants.

39. I specifically asked her if she had ever told Mike Briseno that Juan Mata had hired a "hit man" to kill Mr. Briseno.

40. Maritza Torres informed me first that she did not make any such statement.

4

41. She then revised her statement to me to say that she "said what he [Mike Briseno] told me to" or words to similar effect and could not remember what she had said at his request.

42. It was not completely clear to me if Ms. Torres was referring to talking directly to Mike Briseno or to someone else, although it seemed that she was referring to reporting what she was told to say to someone else. Because the information that she was providing to me was completely voluntary I did not want to press her further.

43. I did ask Ms. Torres if she would be willing to sign a statement summarizing what she had told me.

44. Ms. Torres refused and stated that "Briseno's going to get Juan" or words to similar effect.

45. Ms. Torres demeanor indicated, in my opinion, that she was frightened of Mike Briseno.

46. I learned later that Juan Mata had been criminally charged based upon the allegation that a) he wrote the letter that I wrote and that Ronald R. Adamson reviewed and signed b) that he was harassing Mike Briseno based upon information provided to him by the private investigator retained in the prior civil rights case and because he had hired a "hit man" from Juarez to kill Mike Briseno, and c) that he was stalking Mike Briseno based upon, I assume, some combination of the foregoing.

47. I was asked to testify as to my action, to wit: drafting the letter for review and signature at Juan Mata's district court trial.

48. I was not asked to testify regarding my interaction with Maritza Torres at that trial. I do not know if that was as a result of a court ruling or if Mr. Mata's attorney, Dennis W.

Montoya did not choose to ask me about it.

49. Bill Cooke, the prosecuting attorney, did not ask me about Ms. Torres.

50. I am aware that a state district court judge has found Mike Briseno's testimony, under oath, to be not credible. I no longer remember the name of that judge.

51. I am also aware that Hon. C. Leroy Hansen found Mr. Briseno to be not credible in his testimony, under oath, in the U.S. District Court for the District of New Mexico after Mr. Briseno testified at a hearing on a criminal defendant's motion to suppress.

52. I believe that it is common-knowledge that Mr. Briseno has been found to be not credible while testifying under oath and, furthermore, I believe such a finding would commonly be referred to as lying.

53. I have certainly referred to Mr. Briseno as a liar.

54. In the case of Mitchell v. Briseno, Mike Briseno utilized the services of an individual who had not previously "worked for" the Farmington Police Department.

55. Although that individual refused to testify on Fifth Amendment grounds, that person subsequently admitted to me and at least one other person that he "gave the bust signal" despite the fact that no one was present to sell him any drugs and, furthermore, stated that he dropped a "rock" of crack cocaine on the ground to make it appear that he had been approached by a drug dealer outside of Chester Mitchell's home.

56. Either I or someone else who was made aware of this information may have relayed the same to Juan Mata.

57. The "rock" of cocaine that the aforementioned individual dropped on the ground was never recovered by the Farmington Police, however a single "rock" of crack cocaine was

"found" inside Mr. Mitchell's home.

58. I believe that such circumstances indicate that Mr. Briseno is an individual with little or no integrity.

59. I have certainly referred to Mike Briseno as a dirty cop.

60. I have heard numerous other people espouse the same opinion.

61. Following the conclusion of the criminal case in district court against Mr. Mata—which resulted in an acquittal—I had the occasion to speak to Arlon L. Stoker about the case.

62. Mr. Stoker informed me that his then-girlfriend, Monica Nagl, was present when Sgt. Anderson stated that he "would find a way to get" Juan Mata or words to similar effect.

63. I am aware that Mike Briseno was under surveillance by at least one private investigator.

64. I am personally aware that the surveillance was not requested by Juan Mata.

**FURTHER AFFIANT SAITH NOT.**

                                                      **ORIGINAL SIGNED BY**
                                                      _____
                                                      BRANDON CUMMINGS

SUBSCRIBED AND SWORN TO before me this 3rd day of November, 2009 by BRANDON CUMMINGS.

                                                      **ORIGINAL SIGNED BY**
                                                      _____
                                                     NOTARY PUBLIC

My Commission Expires:

_____