IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JUAN MATA,

       Plaintiff,

vs.                                                                              No. CIV 08-0046 JB/RLP

SGT. RON ANDERSON,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Ron Anderson's Motion for Summary Judgment, filed October 19, 2009 (Doc. 36).   The Court held a hearing on December 18, 2009.  The primary issue is whether Defendant Sgt. Ron Anderson is entitled to summary judgment on Plaintiff Juan Mata's Second Amended Complaint for First-Amendment retaliation, Fourth-Amendment malicious prosecution, and malicious abuse of process in violation of New Mexico common law.  Resolution of Anderson's summary judgment motion turns on five sub-issues: (i) whether a November 2005 settlement agreement executed by J. Mata releases Anderson from J. Mata's First-Amendment and malicious-abuse-of-process claims; (ii) whether J. Mata has presented a genuine issue of material fact that Anderson lacked probable cause to file criminal charges of criminal libel, harassment, and stalking against J. Mata; (iii) whether the court proceedings against Mata constitute a seizure under the Fourth Amendment ; (iv) whether Anderson, even if there was no probable cause, is entitled to qualified immunity; and (v) whether the statute of limitations bars J. Mata's malicious abuse of process claims.  To the extent that J. Mata's claims accrued after the November 2005 settlement agreement, the Court will deny Anderson's motion for

summary judgment on those claims on that basis, but will grant summary judgment on any portion of the claims that accrued before the settlement agreement.  The Court will find that J. Mata's First-Amendment retaliation claims and his state tort malicious-abuse-of-process claims accrued before November 2005 and will therefore grant Anderson summary judgment as to those claims. Because the Court finds that J. Mata has shown genuine issues of material fact regarding the validity of the facts Anderson used in his probable-cause determination, the Court will not grant Anderson summary judgment on that basis.   The Court will grant summary judgment on the Fourth-Amendment malicious-prosecution claims because the United States Court of Appeals for the Tenth Circuit has rejected the notion that seizure includes restrictions imposed upon a plaintiff during his or her court proceedings, and because J. Mata did not suffer a traditional seizure.  The Court will also find that there are enough facts for a jury to determine that a reasonable officer in Anderson's position would not have brought charges against J. Mata based on the information Anderson had and therefore qualified immunity is inappropriate.  Finally, the Court will find that, although pre-filing notice was not required, state law required him to bring his state tort claims within two years of the filing of the lawsuit against him, and therefore his state tort claims are time barred.  Because the Court finds that there are no remaining viable claims, the Court will grant Anderson's motion for summary judgment.

## FACTUAL BACKGROUND

The facts of this case are partially undisputed. All material facts set forth in Anderson's motion are deemed admitted unless J. Mata specifically controverted those assertions.  See D.N.M. LR-CV 56.1(b)("All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.").   To the extent that J. Mata has controverted Anderson's undisputed facts with competent evidence, the Court has noted the discrepancies and viewed the

facts in the light most favorable to J. Mata, as the non-moving party.

In the background of this lawsuit is an incident that occurred between J. Mata and the Farmington, New Mexico Police Department in 2002.  J. Mata alleges that his civil rights were violated during a November 29, 2002 arrest in which he was pepper sprayed by Officer Mike Briseno of the Farmington Police Department.  J. Mata was one of several Mata family members who filed a civil-rights lawsuit on November 28, 2004 against the City of Farmington and several police officers, including Briseno.  See Mata v. Briseno, No. CIV 04-1334 ACT/RLP, Complaint, filed November 28, 2004 (Doc. 1).  A year later, J. Mata and his family settled all claims arising from the November 29, 2002 incident for $75,000.00, see Plaintiffs' [sic] Response to Defendant Ron Anderson's Motion for Summary Judgment, filed November 6, 2009 (Doc. 38)("Response").

J. Mata executed a settlement agreement on December 6, 2005, see Affidavit of Ezora Boognl ¶ 3, at 1, filed October 19, 2009 (Doc. 34)("Boognl Aff."); Boognl Aff. Exhibit 1 (Doc. 34-2).  In the settlement of his lawsuit against the City of Farmington and several of its police officers, Mata agreed as follows:

> Plaintiffs hereby expressly release, forever discharge, and acquit Defendants and their agents, predecessors and successors, employees, insurers, representatives and attorneys ("Released Parties") from all claims, suits, costs, debts, demands, actions and causes of action which they had or might have had against the Released Parties, arising out of or in any way related to the claims which were made or could have been made in the Action or in any way arising out of the facts or occurrences that could or did form the basis of the Action, or for any other reason including, but not limited to, any and all claims based in tort, contract, statute, ordinance, or law of any nature whatsoever, and any and all claims under any other federal, state or local statute, ordinance, or law.
>
> This Agreement therefore shall be construed to extinguish and discharge all claims included in the Action and any and all claims that Plaintiffs now have or could hereafter assert against any of the Released Parties of any nature whatsoever.

Boognl Aff. ¶ 3, at 1; Boognl Aff. Ex. 1.

On May 12, 2003, the Farmington Police Department received a petition delivered by Gregoria Mora, J. Mata's mother, which he and others had signed, alleging that Briseno had engaged in illegal stops and searches of vehicles, and of several persons. See Affidavit of Ron Anderson ¶ 5, at 2 (executed September 23, 2009), filed October 19, 2009 (Doc. 35)("Anderson Aff."). One-hundred-eighty-eight people sighed the petition, but some signed first names only or fictitious names, such as "Mr. and Mrs. Annomous" [sic]. Farmington Police Department Administrative Investigation Citizen Complaint, Exhibit 1 to Anderson Aff., filed October 19, 2009 (Doc. 35-2) ("Petition Investigation").

Internal Affairs conducted an investigation into the allegations in the petition. See Anderson Aff. ¶ 5. Internal Affairs investigated the improper conduct alleged in the May 12, 2003 petition by sending letters to the 147 people whose names and addresses they could decipher from the petition. See Petition Investigation at 2. Of the 147 individuals, only twenty contacted the police department during the next five weeks. See Petition Investigation at 9. Of the twenty individuals, sixteen stated that they never had negative contacts with Briseno, and seven stated that they did not sign the petition and that someone who knows them must have forged their names. See Petition Investigation at 9. Eight individuals stated that they signed the petition. See Petition Investigation at 9. J. Mata's sister, Maria Mata, formerly Maria Martinez, contacted internal affairs regarding the petition, and stated that she signed the petition because her mother told her about an incident where Briseno slammed a 13-year old boy to the ground and because she feels that the Farmington Police Department is unprofessional. See Affidavit of Maria Mata ¶ 5, at 1 (executed November 5, 2009), filed November 6, 2009 (Doc. 38-2)("M. Mata Aff."); Petition Investigation at 7-8.[1]   The

---

[1] The Petition Investigation states: "Ms. Martinez said she does not have any direct knowledge of unprofessional behavior on the part of Officer Briseno." Petition Investigation at 7.

investigation, completed in early July 2003, determined that the complaint was unsustained.  See Petition Investigation at 9.[2]

On May 20, 2003, Anderson received an interoffice memorandum from Briseno regarding a potential death threat against him by J. Mata.  See Anderson Aff. ¶ 7, at 2; City of Farmington Interoffice Memorandum (dated May 20, 2003), Anderson Aff. Exhibit 2, filed October 19, 2009 (Doc. 35-3).[3]  On May 23, 2003, Anderson received another interoffice memorandum from Briseno

_____

In her affidavit, M. Mata states: "In his written statement regarding this interview Kennedy stated that I said I had no firsthand knowledge of the actions of Officer Briseno; This is a misstatement of what I said in that interview.  I am well aware of what Officer Briseno has done to individuals in this community and to my own brother, Juan Mata."  M. Mata Aff. ¶¶ 4-5, at 1.

[2] J. Mata's Response states that he disputes in part the facts about the investigation; however, he does not state which facts he disputes.  Instead, J. Mata states only that the Farmington Police Department designed the investigation to intimidate the signers of the petition and succeeded in doing so.  To support this assertion, he submits the affidavit of Alice Atencio, who attests that she signed the petition against Briseno, had not been personally victimized by Briseno, but had knowledge of others whom Briseno had mistreated.  See Affidavit of Alice Atencio ¶¶ 2-3, at 1 (executed November 5, 2009), filed November 6, 2009 (Doc. 38-3)("Atencio Aff.").  According to Atencio, she received but did not respond to the letter from Internal Affairs because it stated that Briseno stopped her and conducted a search of her vehicle, which she found to be a misrepresentation of the petition she signed.  Atencio states: "Because of the wording of this letter I, and I suspect many others, were discouraged from taking further action."  Atencio Aff. ¶¶ 4-7, at 1-2.  She further states: "By circulating an improperly worded letter distorting the objective of the concerned citizens of Farmington, the Farmington Police Department succeeded in silencing me, and I suspect many others."  Atencio Aff. ¶ 8, at 2.  Because J. Mata has not brought any evidence to dispute that the petition was received, an investigation was conducted, and the results of the investigation, the Court will deem as admitted the facts about the petition as Anderson has stated them.  Moreover, the Court will accept the portions of Atencio's Affidavit based on her personal knowledge.  Specifically, the Court will accept that she did not respond to the letter from Internal Affairs because she believed it misrepresented the petition she signed.  The Court will not, however, give weight to the assertions that the letter from Internal Affairs discouraged others or silenced others; such evidence is inadmissible because it appears to be speculation rather than based on personal knowledge.

[3] J. Mata's Response states that he disputes in part these facts; however, he does not state which facts stated he disputes.  Instead, he asserts: "While Officer Briseno may have sent the interoffice memorandum it was wholly based upon falsehoods."  Response at 6.  J. Mata makes this assertion based upon a statement in the Affidavit of Brandon Cummings, a paralegal for attorney

regarding possible threats by J. Mata.  See Anderson Aff. ¶ 8, at 2-3; City of Farmington Interoffice

Memorandum (dated May 23, 2003), Anderson Aff. Exhibit 3, filed October 19, 2009 (Doc. 35-4).

According to the memoranda, the alleged information about a hit-man and threats came from

conversations Briseno and a fellow Farmington police officer, Officer Hooper, had with J. Mata's

ex-wife Maritza Torres.  See Anderson Aff. ¶¶ 7-8, at 2-3 and Exhibits 2 & 3.

On September 9, 2004, the Farmington Police Department received a letter from the office

of local attorney Ronald R. Adamson requesting an administrative investigation regarding Officers

Kent O'Donnell and Briseno.  See Anderson Aff. ¶ 13, at 4; Farmington Police Department

Administrative Investigation (dated Sept. 9, 2004), Anderson Aff. Exhibit 4, filed October 19, 2009

(Doc. 35-5)("Letter Investigation").[4]  According to Brandon Cummings, Adamson's employee,

Adamson asked Cummings to review a videotape of a police car following J. Mata's vehicle, which

Cummings describes as portraying a police car following J. Mata's vehicle so closely that the

headlights of the police vehicle disappeared.  See Affidavit of Brandon Cummings ¶¶ 3-4, at 1

(executed November 3, 2009), filed November 6, 2009 (Doc. 38-4).  Cummings states that he and

---

Ronald R. Adamson.  In his affidavit, Cummings asserts that he asked Maritza Torres, J. Mata's
ex-wife, if she had ever told Briseno that J. Mata had hired a hit man to kill Briseno.  Cummings
states that Torres informed him that she did not make any such statement.  See Cummings Aff.
¶¶ 39-40, at 4.  Although the Court will accept Cummings' question as evidence, Torres' response
is inadmissible hearsay offered for the truth that the interoffice memorandum was "wholly based
upon falsehoods," and the Court will not consider it.  Because J. Mata has not disputed with
competent evidence the facts about the memoranda as Anderson has stated them, the Court will
deem as admitted the facts as Anderson has stated them.

[4] The Administrative Investigative Report states that the letter was sent on behalf of J. Mata.
See Letter Investigation at 1.  In his affidavit, Cummings states that he drafted the letter, Adamson
reviewed and signed it, and neither of them ever discussed it with J. Mata or sought permission from
J. Mata to send it.  See Cummings Aff. ¶¶ 10-16, at 2.  Although J. Mata did not dispute that the
letter was sent on behalf of J. Mata in his Response, the Court notes that Cummings' affidavit in
support of J. Mata's Response asserts that the letter was not sent on behalf of J. Mata.

Adamson believed the vehicle was the police cruiser assigned to Briseno, and that he assumed that the driver or passenger was Briseno.  <u>See</u> Cummings Aff. ¶¶ 19-20, at 2.  According to the letter, on August 4, 2004, O'Donnell and Briseno pursued a van that J. Mata was driving at a high rate of speed and shined a spotlight into the van.  <u>See</u> Letter Investigation at 2.  The letter states that the alleged conduct amounted to intimidation and retaliation of witnesses in a pending litigation, abuse of children that were in the van, and aggravated assault -- a total of eleven alleged felonies committed by O'Donnell and Briseno.  <u>See</u> Letter Investigation at 2.[5]  After learning of the letter, Anderson checked Briseno's duty schedule and learned that, not only was Briseno not on duty at the time of the alleged felonies, he was also out of the state on vacation.  <u>See</u> Anderson Aff. ¶ 15, at 4.

Sometime in mid-September of 2004, Anderson spoke with Bill Cooke of the City Attorney's office, seeking advice on how to handle the petition, memoranda, and letter from Adamson, all involving Briseno and J. Mata.  <u>See</u> Anderson Aff. ¶ 17, at 5.  On October 28, 2004, J. Mata appeared outside the Farmington Police Department displaying signs stating "Briseno is a Liar" and "dirty."  Anderson Aff. ¶ 19, at 5; Photograph of Mata, Anderson Aff. Exhibit 5 at 1-2, filed October 19, 2009 (Doc. 35-6).  At the end of November, 2004, Anderson met with Cooke to discuss the situation between Briseno and J. Mata.  <u>See</u> Anderson Aff. ¶ 21, at 5-6.  Cooke informed Anderson that he believed J. Mata's action violated one or more criminal statutes and that he was in the process of researching the criminal statutes and preparing a criminal complaint.  <u>See</u> Anderson

---

[5] J. Mata states that the letter is disputed in part, because it was later determined that, though the letter stated that O'Donnell and Briseno engaged in unlawful acts, it was subsequently determined that O'Donnell and Officer David Griego, not Briseno, operated and/or occupied the unmarked police vehicle.  <u>See</u> Response at 6; Cummings Aff. ¶¶ 20, 23-24.  Because this evidence does not dispute the facts Anderson submits, the Court will deem Anderson's facts on the letter admitted as stated.

Aff. ¶ 21, at 5-6.[6]  Anderson met with Cooke on January 11, 2005, and signed a Criminal Complaint and a Statement of Probable Cause that Cooke had prepared for Anderson's signature.  <u>See</u> Anderson Aff. ¶ 22, at 6.  J. Mata learned of the criminal charges when he received a letter in the mail advising him to appear in court.  <u>See</u> Transcript of Videotaped Deposition of Juan Mata at 92:14-93:11 (taken July 8, 2009), filed October 19, 2009 (Doc. 36-2).  At no time before or after he received the criminal complaint was J. Mata arrested, handcuffed, or taken into custody.  <u>See</u> J. Mata Depo. at 93:12-96:14.  J. Mata was not required to report to a police station or stay in his house, and was free to leave the Court and go about his business.  <u>See</u> <u>id.</u>

When J. Mata appeared for his proceeding in the New Mexico Magistrate Court for the County of San Juan, he, along with others waiting for their court proceedings, were shown a video informing them that there were charges pending against them and advising them of restrictions imposed upon them, such as not leaving the country and not going to establishments that sell liquor. <u>See</u> J. Mata Depo. at 94:6-20.  Through his counsel, J. Mata had the opportunity to present evidence and argument to the New Mexico Magistrate Court for the County of San Juan.  <u>See</u> J. Mata Depo.

_____

[6] J. Mata disputes this fact, stating that Anderson and Cooke met to determine with which crimes they might be able to charge him to retaliate against him for criticizing Briseno and other officers.  <u>See</u> Response at 7.  J. Mata cites to the entirety of Cummings' Affidavit and of Nagl's Affidavit.  The Court reviewed Cummings' Affidavit, but was unable to find any competent evidence to support J. Mata's contention that the meeting did not take place as Anderson has stated. Nothing in Cummings' Affidavit conveys personal knowledge of Anderson's motive during his meeting with Cooke.  The affidavit contains one inadmissible triple-hearsay statement from Arlon L. Stoker, Nagl's boyfriend --  a statement that Anderson allegedly made in Nagl's presence -- which she told to Stoker, and which Stoker then conveyed to Cummings.  <u>See</u> Cummings Aff. ¶ 62, at 7.  The Court does not consider such triple-hearsay as competent evidence of Anderson's intent.  J. Mata also points the Court to Nagl's Affidavit, which contains an exchange between her and Anderson about her assisting Anderson with legal research in September 2004.  A party admission that Anderson made two months before his meeting with Cooke stating "Oh. Juan Mata. There's got to be something in here.  He's not going to get away with this," is some evidence of Anderson's intent at the meeting and so the Court will accept this evidence.  Nagl Aff. ¶ 2, at 2.

at 95:10-11.  The magistrate jury convicted J. Mata on all three counts.  <u>See</u> Exhibit E to Answer,

Magistrate Verdict Forms, filed July 7, 2008 (Doc. 8-6).[7]  J. Mata appealed his conviction to the

New Mexico state district court.  At the district court, the district judge dismissed the criminal libel

charge, finding it unconstitutional, and allowed the other two charges to proceed to the jury.  <u>See</u>

Mata Depo. at 100:1-12.  The jury acquitted J. Mata of harassment and stalking on July 17, 2006.

<u>See</u> Plaintiff's Response to Sergeant Anderson's Motion to Dismiss for Failure to Timely Serve or

in the Alternative for Judgment on the Pleadings Exhibit A, <u>State v. Mata</u>, Case No. D-1116-

LR-200500048, Docket Report at 1, filed July 21, 2008 (Doc. 11-2).

The City of Farmington did not receive any Notice pursuant to the Tort Claims Act from

J. Mata, his attorneys, or anyone purporting to act on his behalf in connection with the criminal

charges filed against him in the New Mexico Magistrate Court for the County of San Juan.  <u>See</u>

Affidavit of Ezora Boognl ¶ 4, at 2 (executed Sept. 10, 2009), filed October 19, 2009 (Doc. 34).

## PROCEDURAL BACKGROUND

J. Mata filed this case on January 11, 2008, asserting a 42 U.S.C. § 1983 claim for alleged

retaliation in violation of the First Amendment.  J. Mata filed his suit in this case for civil-rights

violations three years to the day after the criminal charges against him were filed.  <u>See</u> <u>State v.</u>

<u>Mata</u>, M-47-MR-200500028, Farmington Magistrate Court, Copy of Docket Sheet at 1 (dated

January 31, 2005).  On January 24, 2009, the Court issued a Memorandum Opinion and Order

---

[7] The motion directs the Court to Mata's deposition at 92:14-96:14, but there is no
information contained therein referring to the outcome of the magistrate proceeding.  The Court,
however, notes that the Court may consider the exhibits previously attached and on file with the
Court from previous pleadings.  <u>See</u> Fed. R. Civ. P. 56(c)(2)("The judgment sought should be
rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that the movant is entitled to judgment as a
matter of law.").

denying Anderson's motion to dismiss for failure to timely serve and for failure to establish a claim for First-Amendment retaliation.  See Memorandum Opinion and Order at 67 (Doc. 17).  The Court excused J. Mata's failure to timely serve and granted him an extension of time to complete service. See Memorandum Opinion and Order at 37.  The Court also found that J. Mata, on the face of his Complaint, sufficiently stated a claim for retaliatory prosecution and rejected the notion that the magistrate-jury conviction constituted conclusive proof of the existence of probable cause.  See Memorandum Opinion and Order at 44.  The Court also found that, taking the allegations in the Complaint as true, Anderson was not entitled to absolute or qualified immunity from J. Mata's First Amendment retaliation claim.  See Memorandum Opinion and Order at 58-66.  Finally, the Court granted leave for J. Mata to file an Amended Complaint.  See Memorandum Opinion and Order at 66.

On February 2, 2009, Mata filed his Second Amended Complaint, which changed his Complaint from asserting one count of First-Amendment retaliation to asserting ten counts.  See Second Amended Complaint for Violation of Civil Rights under Color of State Law and State Tort Claims, filed February 2, 2009 (Doc. 18).  His Second Amended Complaint asserts three counts of First-Amendment retaliation -- one for the criminal libel charge, one for the harassment charge, and one for the stalking charge -- three counts of Fourth-Amendment malicious prosecution,  and four counts of malicious abuse of process.  See Second Am. Complaint ¶¶ 36- 102, at 6-19.

Anderson now moves for the Court to enter summary judgment in his favor on all ten counts in J. Mata's Second Amended Complaint.  Anderson argues that, even taking the evidence in the light most favorable to J. Mata, there are no genuine issues of material fact and therefore the Court should grant summary judgment in Anderson's favor on all claims.

-10-

1.      <u>**Arguments Regarding Lack of Probable Cause.**</u>

First, Anderson asserts that lack of probable cause is an essential element to J. Mata's First-Amendment claims, Fourth-Amendment claims, and state-law malicious-abuse-of-process claims, and that J. Mata will be unable to demonstrate that Anderson lacked probable cause to bring charges of criminal libel, harassment, and stalking against J. Mata.  <u>See</u> Motion at 6.  Anderson argues that he had probable cause at the time he filed criminal charges against J. Mata because, at that time, he knew that: (i) J. Mata had accused Briseno of illegally stopping and searching vehicles and persons, which were unsubstantiated according to internal affairs' investigation; (ii) the memorandum he had received from Briseno stated that J. Mata had hired a hit-man to "take out" Briseno; (iii) the memorandum he had received from Briseno stated that J. Mata had hired a private investigator to follow Briseno; (iv) Adamson's letter stated that Briseno had committed eleven felonies, which allegedly occurred during a time when Briseno was on vacation out of state; (v) J. Mata had held up signs outside the Farmington police station stating that Briseno was a "liar" and "dirty."  Motion at 11-12.  Anderson argues that the picket signs, the letter from Adamson, and the petition were sufficient to establish a probability that J. Mata had circulated false and malicious statements about Briseno affecting his reputation, which gave rise to the criminal libel charge, and these activities, along with the threats, were sufficient to establish a probability that J. Mata had engaged in a pattern of activity intended to annoy Briseno and place him in reasonable fear of bodily harm, which gave rise to the harassment and stalking charges.  <u>See</u> Motion at 12.  Anderson also argues that the fact that the charges were not dismissed at the magistrate court level bolsters the existence of probable cause.  <u>See</u> Motion at 12.

In his response, J. Mata argues that he has sufficiently shown that Anderson lacked probable cause to bring claims of criminal libel, harassment, and stalking against J. Mata.  J. Mata argues that

an officer may not rely upon laws "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see [their] flaws," <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 38 (1979), and that criminal libel falls into this category, <u>see</u> Response at 9.  J. Mata also argues that hiring a private investigator, whom J. Mata contends his attorney hired, cannot give rise to a claim for harassment.  <u>See</u> Response at 9.  J. Mata also argues that his supposed hiring of a hit-man is a fabrication by a member of the Farmington Police Department.  <u>See</u> Response at 9-10.  J. Mata contends that Anderson's response to the alleged threat -- not the filing of a charge for attempted solicitation of murder, but rather the filing of a misdemeanor charge for harassment -- supports his conclusion that the Farmington Police Department did not believe the hit-man story.  <u>See</u> Response at 10.  J. Mata also argues that there is no evidence that he hired a private investigator and that, even if there was such evidence, private investigators are not subject to the stalking prohibition.  <u>See</u> Response at 10.  J. Mata also contends that his state-law claims do not require a showing of a lack of probable cause, but rather require a showing of procedural impropriety, and he states that "[t]here is ample evidence that the process against [J. Mata] was so perverted and [J. Mata's] state law claim should survive Defendant's motion."[8]  Response at 12.

In reply, Anderson argues that J. Mata offered nothing more than conclusory allegations of procedural impropriety and fails to cite with particularity those portions of the record upon which he relies for the proposition that there is ample evidence that the process against J. Mata was perverted.  <u>See</u> Reply at 11 (citing D.N.M. LR-CV 56(b)).  Anderson further argues that J. Mata has offered nothing to show that Anderson knew or should have known that the information he was provided was false.  <u>See</u> Reply in Support of Defendant Ron Anderson's Motion for Summary

---

[8] J. Mata did not identify any specific evidence for the Court to support his contention that there is "ample evidence" of procedural impropriety.

Judgment at 8, filed November 23, 2009 (Doc. 40)("Reply").  Anderson maintains that the facts known to him as set forth in his affidavit establish a probability of criminal conduct and the existence of probable cause, and because probable cause is an essential element of Counts I-VII of J. Mata's Second Amended Complaint, the Court should grant summary judgment in favor of Anderson on those claims.  See Reply at 9.

At the hearing on the motion, Erin E. Langenwalter, on Anderson's belief, argued that, although the Court found previously that J. Mata's conviction by the magistrate jury is not conclusive evidence of the existence of probable cause, the Court should consider it as additional evidence supporting a finding of probable cause.  See Transcript of Hearing at 11:16-21 (taken December 18, 2009)("Tr.")(Langenwalter).[9]  Dennis W. Montoya, J. Mata's attorney, argued that Anderson knew better or should have known better that a letter from an attorney, a petition, and picketing in front of the police station -- the only things cited in Anderson's Statement of Probable Cause -- do not establish probable cause that J. Mata had engaged in criminal behavior.  See Tr. at 26:1-10 (Montoya).  He also argued that a reasonable jury could look at the facts in the statement of probable cause and determine that there was an ulterior motive designed to target J. Mata.  See Tr. at 26:23-27:4 (J. Mata).

## 2.   Arguments Regarding Qualified Immunity.

Anderson argues that even if the Court finds that there is evidence that probable cause was lacking, he is entitled to qualified immunity, because the facts he gathered could have led a reasonable police officer in his position to believe that J. Mata committed a crime.  See Motion at 14; Reply at 10.  Anderson also contends that an officer who files criminal charges only after the

---

[9] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

city attorney fully advises the officer that probable cause supports the charges brought is entitled to qualified immunity.  <u>See</u> Motion at 14.  J. Mata did not address Anderson's argument for qualified immunity in his response.  In the hearing, however, Mr. Montoya argued that this is not the case that qualified immunity was designed to protect.  <u>See</u> Tr. at 26:10-11 (Montoya).  He contends that this case falls "into the heartland of plain incompetence or malice."  Tr. at 26:11-12 (Montoya).  In his reply brief, Anderson argues that case law clearly establishes that, when an officer seeks guidance from a legal advisor and acts on that guidance, he should be entitled to qualified immunity.  <u>See</u> Reply at 10 (citing <u>Hollingsworth v. Hill</u>, 110 F.3d 733 (10th Cir. 1997)(finding that a deputy sheriff was entitled to qualified immunity because it was objectively reasonable for him to believe his actions did not violate plaintiff's rights, given that he had sought the district attorney's advice and relied on that advice)).

At the hearing, Ms. Langenwalter once more emphasized that Anderson's reliance on legal counsel establishes his right to qualified immunity.  <u>See</u> Tr. at 16:8-13 (Langenwalter).  She argued that qualified immunity is intended to apply in this case -- where an officer thinks that a criminal act has been committed, consults with legal counsel, and then brings a criminal complaint.  <u>See</u> Tr. at 20:17-21:1 (Langenwalter).

### 3.    <u>Arguments Regarding the November 2005 Settlement.</u>

Anderson also argues that J. Mata's November 2005 settlement agreement with the City of Farmington and Farmington police officers specifically released all claims against the City of Farmington and its agents and employees, and thus J. Mata cannot now assert claims of First-Amendment retaliation and malicious abuse of process which stem from the filing on criminal charges against J. Mata in January 2005.  <u>See</u> Motion at 21-22.  J. Mata did not address Anderson's argument that he released his claims pursuant to his prior settlement agreement in his response.

-14-

At the hearing, Ms. Langenwalter argued that the 2005 settlement agreement releases Anderson from both the First-Amendment retaliation claims and the state-tort malicious-abuse-of-process claims, because they both accrued before the signing of the settlement agreement. Ms. Langenwalter conceded that the settlement agreement does not release the Fourth-Amendment claims because they would not have accrued until J. Mata was acquitted of the charges brought against him. See Tr. at 18:5-23 (Langenwalter, Court).

Mr. Montoya argued that the 2005 settlement agreement pertained to completely separate events and did not involve actions by Briseno with respect to J. Mata's exercise of his First-Amendment claims. See Tr. at 21:21-25 (Montoya). Moreover, Mr. Montoya argues, the prosecution of the claims brought against J. Mata continued until he was acquitted of harassment and stalking and until the criminal libel claim was thrown out as unconstitutional. See Tr. at 22:10-16 (Montoya).

### 4.    Arguments Regarding Seizure Requirement of Fourth-Amendment Malicious Prosecution.

With regard to J. Mata's Fourth-Amendment malicious-prosecution claim, Anderson argues that, even if J. Mata can establish that Anderson lacked probable cause, he cannot bring a Fourth-Amendment malicious prosecution claim unless he was seized. Anderson contends that the only deprivation of liberty J. Mata suffered was the necessity of attending his trial and defending against the charges brought against him. See Motion at 19. J. Mata did not address in his response Anderson's argument that seizure is required for a Fourth-Amendment malicious-prosecution claim.

In the hearing, Mr. Montoya argued that though he concedes that there was no arrest, J. Mata was placed under restraint of his liberty during the entire pendency of the criminal case because of the restrictions imposed on him, including prohibition from entering an establishment that sells

liquor, prohibition from carrying a firearm, and other pretrial conditions.  <u>See</u> Tr. at 29:1-7 (Montoya).

**5.      Arguments Regarding New Mexico Tort Claims Act's Notice Requirement and Statute of Limitations**

Anderson argues that J. Mata's malicious-abuse-of-process claims also fail because he did not comply with the notice requirement under the New Mexico Tort Claims Act ("NMTCA"), NMSA 1978 § 41-4-4, and because his claims are time-barred under the Act's two-year statute of limitations.  <u>See</u> Motion at 22.  Anderson contends that J. Mata should have filed a notice of tort claim for malicious abuse of process no later than April 25, 2005, which is ninety days after his February 1, 2005 arraignment, and that neither Anderson nor the City of Farmington received such notice.  <u>See</u> Motion at 23.

Moreover, Anderson asserts that J. Mata's malicious-abuse-of-process claim accrued once he learned of the criminal charges against him, which would have been no later than his February 2005 arraignment, and therefore J. Mata needed to file his malicious-abuse-of-process claim by February 2007 to avoid a statute-of-limitations bar.  <u>See</u> Motion at 24.  J. Mata asserted his malicious-abuse-of-process claim in his Second Amended Complaint, filed on February 2, 2009; however, Anderson argues that, even if the claim relates back to the filing of the original Complaint on January 11, 2008, the claim is still untimely.  <u>See</u> Motion at 24.  J. Mata responds that, because he did not learn "of [Anderson's] desire to 'get him'" until after his criminal case resulted in an acquittal, he should not be time barred from bringing suit.  Response at 12 (citing <u>Butler v. Deutsche Morgan Grenfell, Inc.</u>, 140 N.M. 111, 140 P.3d 532 (Ct. App. 2006)).

J. Mata concedes that he did not file a NMTCA notice in connection with his malicious-abuse-of-process claim.  <u>See</u> Response at 8.  J. Mata contends, however, that such notice

must only be filed against municipal entities and that individuals are not entitled to a Tort Claims Notice in New Mexico.  <u>See</u> Response at 8.

At the hearing, Mr. Montoya stated that the two-year statute of limitations may eliminate some portion of J. Mata's state-law tort claims for malicious abuse of process, but argued that, because the claims were brought within two years of J. Mata's acquittal, some claims are timely. <u>See</u> Tr. at 31:25-32:6 (Montoya).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  <u>See</u> <u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts that would be admissible in evidence showing that there is a genuine issue for trial. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 324.  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  "It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the

burden of proof.")(internal quotation omitted); Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990)(the party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(internal quotation omitted).

"The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 U.S. Dist. LEXIS 45838, at * 1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. The mere existence of a scintilla of evidence will not avoid summary judgment. See Vitkus v. Beatrice Co., 11 F.3d at 1539. There must be sufficient evidence on which the fact-finder could reasonably find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251; Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."

-18-

Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## LAW REGARDING FIRST-AMENDMENT RETALIATION CLAIMS

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'"  Hartman v. Moore, 547 U.S. 250, 256 (2006)(quoting Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1988)).  It is therefore "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. at 256 (citation omitted).

The Supreme Court of the United States has described at least two variations of First-Amendment retaliation claims.  First, there are those claims that arise when a public employee alleges that he has been fired or otherwise punished for speech criticizing the government.  See id. at 260 (citing Pickering v. Board of Education of Township High School Dist. 205, Will Cty., 391 U.S. 563, 566-67 (1968)).  In such cases, the Supreme Court has explained: "[O]ur discussions of the elements of the constitutional tort do not specify any necessary details about proof of a connection between the retaliatory animus and the discharge, which will depend on the circumstances."  Hartman v. Moore, 547 U.S. at 260.  Rather, "[t]he cases have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other."  Id.

In contrast, when a plaintiff asserts that the retaliation for protected conduct is a criminal charge, the "constitutional tort action will differ from this standard case in two ways."  Id.  First, in

-19-

retaliatory-prosecution cases, there is always a "distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge." Id. at 261.  Second, the existence of absolute prosecutorial immunity gives rise to an added layer of complexity in retaliatory-prosecution suits.  Specifically, § 1983 actions for retaliatory prosecution

> will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute . . . .  [I]nstead, the defendant will be a non-prosecutor . . . who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute.

Hartman v. Moore, 547 U.S. at 262.

"[T]he causal connection required here is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person and the action of another." Id. (citing Moore v. United States, 213 F.3d 705, 710 (D.C. Cir. 2000)("In order to find that a defendant procured a prosecution, the plaintiff must establish a chain of causation linking the defendant's actions with the initiation of criminal proceedings.").  The allegation needed "both to bridge the gap between the nonprosecuting government agent's motive and the prosecution's action, and to address the presumption of prosecutorial regularity," is "the absence of probable cause." Id.  In retaliatory-prosecution cases, the Supreme Court requires that lack of probable cause be pleaded and proven. See id. at 266;  Becker v. Kroll, 494 F.3d 904, 925 (10th Cir. 2007).

In light of Hartman v. Moore, the United States Court of Appeals for the Tenth Circuit has held:

> To establish a § 1983 retaliation claim against non-immune officials, [a plaintiff] must plead and prove (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill

a person of ordinary firmness from continuing to engage in that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights. Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000). She also must plead and prove the absence of probable cause for the prosecution. Hartman [v. Moore], 126 S.Ct. at 1707.

Becker v. Kroll, 494 F.3d at 925.

"While state law governs limitations and tolling issues, federal law determines the accrual of section 1983 claims." Fratus v. Deland, 49 F.3d 673, 675 (10th Cir. 1995). The statute of limitations for § 1983 claims is drawn from the personal-injury statute of the state in which the federal district court sits. See Wilson v. Garcia, 471 U.S. 261, 269 (1985). Federal law, however, determines the date on which the claim accrues and the limitations period starts to run. See Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007). In New Mexico, federal law borrows the three-year statute of limitations for personal injury set forth in NMSA 1978, § 37-1-8. See Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008).

"A civil rights action accrues when facts that would support a cause of action are or should be apparent." Fratus v. Deland, 49 F.3d at 675. "In general, under the federal discovery rule, claims accrue and [t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." Alexander v. Oklahoma, 382 F.3d 1206, 1215 (10th Cir. 2004). The focus is "on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm. In this context, a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief." Alexander v. Oklahoma, 382 F.3d at 1216 (internal citations omitted).

The Tenth Circuit has not addressed specifically when a First-Amendment retaliation claim accrues. Other courts have found that First-Amendment retaliation claims accrue when a plaintiff knows or has reason to know of the retaliation. See Elliot Reihner Siedzikowski & Egan, P.C. v.

Pa. Employees Benefit Trust Fund, 29 Fed. Appx. 838, 840 (3d Cir. 2002)(holding that a First-Amendment retaliation claim accrues once a plaintiff possesses "the critical facts that he has been hurt and who has inflicted the injury.")(quoting United States v. Kubrick, 444 U.S. 111, 122 (1979)); Harris v. S. Huntington Sch. Dist., No. 06-CV-3879, 2009 U.S. Dist. LEXIS 27392, at *25 (E.D.N.Y. 2009)(stating that "the point of accrual is not when plaintiff utters the alleged protected speech, but rather when he suffers retaliatory action as a result of that speech"); Shub v. Westchester Cmty. College, 556 F. Supp. 2d 227, 242-43 (S.D.N.Y. 2008)(stating that "[u]nder federal law a First Amendment retaliation claim accrues once a plaintiff knows or has reason to know of the injury that forms the basis of the action."); Toscano v. Borough of Lavallette, No. 04-4412, 2006 U.S. Dist. LEXIS 48653, at *10 (D.N.J. June 30, 2006)(stating that First-Amendment retaliation claims accrue "when an alleged retaliatory act occurs."); Firstline Corp. v. Valdosta -- Lowndes County Ind. Auth., 7:03-142, 2005 U.S. Dist LEXIS 21724, at **15-16 (M.D.Ga. Sept. 21, 2005)(stating that plaintiff's First-Amendment retaliation claim accrued when "it knew it was injured and who caused the injury").

The United States Court of Appeals for the Seventh Circuit in Evans v. City of Chicago, 434 F.3d 916 (7th Cir. 2006), rejected the plaintiff's argument that his First-Amendment retaliation claim did not accrue until the termination of his criminal prosecution because the claim involved a continuing tort. The Seventh Circuit found:

> [The plaintiff's] initial argument is that the cause of action did not accrue until the termination of the state criminal proceedings against him in 2000. What [the plaintiff] fails to take into consideration is that the default rule, under Illinois law, is that "a cause of action for personal injuries accrues when the plaintiff suffers injury." Golla v. General Motors Corp., 167 Ill. 2d 353, 360, 657 N.E.2d 894 (Ill. 1995)(citing West American Ins. Co. v. Sal E. Lobianco & Son Co., 69 Ill. 2d 126, 130, 370 N.E.2d 804 (Ill. 1977), and Hermitage Corp. v. Contractors Adjustment Co., 166 Ill. 2d 72, 651 N.E.2d 1132 (Ill. 1995)). In addition, as the district court correctly found, nothing in either federal law or Illinois law tolls or

> delays the running of an applicable statute of limitations on a § 1983 claim until
> criminal proceedings are concluded.  See Pitts v. City of Kankakee, 267 F.3d 592,
> 595 (7th Cir. 2001)(stating that "normally, the statute begins to run from the date of
> an injury" on a § 1983 claims); Kelley v. Myler, 149 F.3d 641, 645 (7th Cir. 1998);
> see also Day v. Morgenthau, 909 F.2d 75, 79 (2d Cir. 1990).   Thus, both [the
> plaintiff's] § 1983 claims and his intentional infliction of emotional distress claims
> are barred, unless the "doctrine of continuing violation" applies.  See Heard v.
> Sheahan, 253 F.3d 316, 319 (7th Cir. 2001).

Evans v. City of Chicago, 434 F.3d at 934.  The Seventh Circuit addressed the plaintiff's allegation

of continuing First-Amendment violations and found that the participation of the officers whom had

allegedly retaliated against the plaintiff in the court proceedings against him did not amount to new

injuries from which the claims accrued.  The Seventh Circuit found that the First-Amendment

retaliation accrued upon the last confirmed interaction between the police officers named in the

complaint and the plaintiff.  See 434 F.3d at 934-35;

       The United States Court of Appeals for the Third Circuit has held that First-Amendment

retaliation claims "will lie for any individual act" which deters a person of ordinary firmness from

exercising his or her First Amendment rights, and those discrete acts cannot be aggregated under

a continuing-violations theory.  O'Connor v. City of Newark, 440 F.3d 125, 126-27 (3d Cir. 2006);

Myers v. County of Somerset, 515 F. Supp. 2d 492, 501 n.1 (D.N.J. 2007)("First Amendment

retaliation claims are not subject to the 'continuing violations' exception to the statute of limitations

that is applicable to hostile work environment claims.  A retaliatory act that infringes upon a

plaintiff's First Amendment rights is a discrete act.")(citing O'Connor v. City of Newark, 440 F.3d

at 126).

       The Tenth Circuit has held that the continuing-violations doctrine applies to hostile work

environment claims, and is also available only to the government and class actions to show proof

of pattern or practice.  Semsroth v. City of Wichita, 304 Fed. Appx. 707, 715 (10th Cir. 2008)("In

-23-

the past, we have noted that the continuing violations doctrine is viable only for hostile work environment claims . . . .  We now conclude that the pattern or practice method of proof is available only to the government and class actions.").  The Tenth Circuit has declined to determine whether the continuing-violations doctrine applies to § 1983 claims.  See Frazier v. Jordan, No. 06-1333, 2007 U.S. App. LEXIS 696, *12 (10th Cir. Jan. 10, 2007)(stating that "Frazier has failed to provide any authority in which this circuit has applied the continuing violations doctrine to a § 1983 claim"); Hunt v. Bennett, 17 F.3d 1263, 1265 (10th Cir. 1994)(declining to determine if continuing violations doctrine applies to § 1983 suits).  The Tenth Circuit recently stated: "Assuming the continuing violations doctrine applies to § 1983 claims, the doctrine is triggered 'by continual unlawful acts, not by continual ill effects from the original violation.'" Parkhurst v. Lampert, 264 Fed. Appx. 748, 749 (10th Cir. 2008)(citing  Bergman v. United States, 751 F.2d 314, 317 (10th Cir. 1984)).

The United States District Court for the Western District of Pennsylvania has reached a different conclusion of when First-Amendment retaliation claims accrue.  In Haagensen v. Pennsylvania State Police, Civ. No. 08-727, 2009 WL 790355 (W.D. Pa. Mar. 25, 2009), the Honorable Donette W. Ambrose, United States Chief District Judge for the Western District of Pennsylvania, adopted the Supplemental Report and Recommendation of the Honorable Robert C. Mitchell, United States Magistrate Judge for the Western District of Pennsylvania, who found that First-Amendment retaliatory prosecution claims do not accrue until the charges against the plaintiff have been dismissed.  See Haagensen v. Pennsylvania State Police, 2009 WL 790355, at *4.  Because the Supreme Court held in Hartman v. Moore that, in a case in which the plaintiff is alleging a claim of First-Amendment retaliation in the form of a prosecution, he or she must also plead and prove the absence of probable cause supporting the prosecution, see 547 U.S. at 266, the plaintiff argued to Judge Mitchell that she could not prove the element of absence of probable cause

-24-

until after the dismissal of the charges, see 2009 WL 790355, at *4.  Judge Mitchell found: "Plaintiff

has raised a valid point: her First Amendment retaliatory prosecution claim did not accrue until the

charges against her had been dismissed."  2009 WL 790355, at *4.  The Court does not find this

determination persuasive.   A probable-cause evaluation looks objectively at the facts and

circumstances within an officer's knowledge at the time the criminal charges were filed.  See Karr

v. Smith, 774 F.2d 1029, 1031 (10th Cir. 1985).  While a conviction by a magistrate or trial court

may establish probable cause, "[t]he fact that the accused was acquitted after trial by a magistrate

or court is properly regarded as immaterial in determining the existence or nonexistence of probable

cause."  Restatement (Second) of Torts  § 667.  Proof of the absence of probable cause does not

require adjudication on the underlying case, and therefore should not be the determinative factor for

accrual of a First-Amendment retaliation claim.

## LAW REGARDING MALICIOUS PROSECUTION UNDER THE FOURTH AMENDMENT.

The Tenth Circuit "has recognized the viability of malicious prosecution claims under

§ 1983."   Taylor v. Meacham, 82 F.3d 1556, 1560 (10th Cir. 1996).  To establish a

malicious-prosecution claim under § 1983, a plaintiff must prove that the defendant initiated or

continued a proceeding against him without probable cause.  See Becker v. Kroll, 494 F.3d 904,

913-14 (10th Cir. 2007).  "Unlike a false arrest or false imprisonment claim, malicious prosecution

concerns detention only after the institution of legal process."  Wilkins v. DeReyes, 528 F.3d 790,

798 (10th Cir. 2008)(internal quotation omitted).  "In this context, a Fourth Amendment violation

can exist only when a plaintiff alleges the legal process itself to be wrongful."  Id.

Under Tenth Circuit case law, a § 1983 malicious prosecution claim includes the following

elements: (i) the defendant caused the plaintiff's continued confinement or prosecution; (ii) the

-25-

original action terminated in favor of the plaintiff; (iii) no probable cause supported the original arrest, continued confinement, or prosecution; (iv) the defendant acted with malice; and (v) the plaintiff sustained damages.  See Wilkins v. DeReyes, 528 F.3d at 799.  In a Fourth-Amendment malicious-prosecution case, "the third element deals only with the probable cause determination during the institution of legal process . . . ."  Id.

**1.      The Seizure Requirement of Fourth Amendment Malicious Prosecution Claims.**

When a malicious-prosecution claim is based upon the Fourth Amendment, a plaintiff must -- to prevail -- prove that he was also seized.  See Nielander v. Bd. of County Comm'rs, 582 F.3d 1155, 1165 (10th Cir. 2009)(citing Albright v. Oliver, 510 U.S. 266, 271 (1994)(plurality)); Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007)("In our cases analyzing malicious prosecution under § 1983, we have always proceeded based on a seizure by the state -- arrest or imprisonment.").

The Tenth Circuit recently addressed the scope of seizure under Fourth Amendment malicious prosecution claims in Becker v. Kroll.  Becker was a physician subjected to a baseless investigation and prosecution for Medicaid fraud.  Her records were subpoenaed, and she was threatened with criminal prosecution if she failed to pay a requested settlement, even though an independent review of her records demonstrated that she had not engaged in any wrongdoing.  When Becker refused to settle, the state first filed a civil suit against her and then pursued criminal charges. She was subjected to a preliminary hearing and was bound over for trial, but was never taken into custody.  The civil and criminal cases were dismissed, but Becker was then subjected to an administrative proceeding that resulted in a finding that she had not engaged in fraud.  Becker argued that the Tenth Circuit should adopt a broader theory of seizure, based on the Supreme Court's decision in Albright v. Oliver.  In that case, the Supreme Court concluded that the Fourteenth Amendment does not provide a substantive due-process right to be free from prosecution

without probable cause, but left open the possibility that a plaintiff could bring such a claim under the Fourth Amendment.  See Albright v. Oliver, 510 U.S. at 274-75.  In a concurring opinion to the plurality opinion, Justice Ginsburg urged the Supreme Court to adopt a non-custodial concept of "continuing seizure" in order to account for, under the Fourth Amendment, the harms incident to the control exercised by the state over a citizen before trial.  See id., 510 U.S. at 278-80 (Ginsburg, J., concurring).  She opined that seizures for Fourth-Amendment purposes include requiring a person to post bond, compelling a person to appear in court, and imposing restrictions on a person's right to interstate travel, all of which might create reputational, emotional, and financial harms.  See 510 U.S. at 278.

The Tenth Circuit declined to adopt Justice Ginsburg's "continuing seizure" analysis. Becker v. Kroll, 494 F.3d at 915 ("To extend liability in cases without a traditional seizure would expand the notion of seizure beyond recognition and fall into the trap carefully avoided by the Albright majority -- every charging decision would support a § 1983 malicious prosecution-type claim no matter the context.").  The Tenth Circuit held that "[a] groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty."  Becker v. Kroll, 494 F.3d at 915.  Because Becker never was required to post bond or appear in court, and alleged no specific restrictions on her freedom of movement (such as travel restrictions), the Tenth Circuit found that she was not seized for Fourth Amendment purposes.  See Becker v. Kroll, 494 F.3d at 915-16.

The Tenth Circuit has also held that having to attend trial is insufficient to constitute a Fourth Amendment seizure for purposes of a malicious-prosecution claim.  The Tenth Circuit stated:

> We agree with the district court that Lewis and Woodman have failed to put forth sufficient evidence showing they were seized for purposes of the Fourth Amendment.  Specifically, the only deprivations of liberty sustained by Lewis are

that he had to attend two trials; he had to appeal his harassment convictions after one of the trials; and he was fingerprinted in connection with one of the summons. Similarly, the only deprivation of liberty sustained by Woodman is that she had to make one, and possibly two, court appearances before the disturbing the peace charge was dismissed. Because Lewis and Woodman have not shown they sustained any other deprivations of liberty in connection with their receipt of the summonses, they have failed to show they were seized in violation of the Fourth Amendment.

Lewis v. Rock, 48 Fed. Appx. 291, 294 (10th Cir. 2002)(citations omitted).

Other circuits have also declined to recognize typical pre-trial release conditions, such as receiving a summons, posting bond, and appearing in court, as a seizure. See DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d Cir. 2005)(finding no cause of action for malicious prosecution because the plaintiffs' attendance at trial did not qualify as a Fourth-Amendment seizure); Kingsland v. City of Miami, 382 F.3d 1220, 1235-36 (11th Cir. 2004)(finding no seizure for Fourth-Amendment purposes when plaintiff was required to post $1000.00 bond, appear at her arraignment, and travel twice from New Jersey to Florida to defend herself in court); Karam v. City of Burbank, 352 F.3d 1188, 1193-94 (9th Cir. 2003)(required signing of "own recognizance" agreement, which obligated woman falsely accused of a misdemeanor to obtain court's permission before leaving state and which compelled her appearance in court, amounted to de minimis restrictions not constituting a Fourth Amendment seizure); Nieves v. McSweeney, 241 F.3d 46, 56 (1st Cir. 2001)(declining to find a seizure based on compelled presence at numerous pre-trial court appearances and at trial, in the absence of a required bond or travel restrictions); Depiero v. City of Macedonia, 180 F.3d 770, 790 (6th Cir. 1999)(finding no Fourth-Amendment seizure where government conduct consisted of an officer issuing a citation that required a court appearance); Riley v. Dorton, 115 F.3d 1159, 1162 (4th Cir. 1997)(refusing to apply Justice Ginsburg's continuing-seizure theory to a claim of excessive force against pre-trial detainees, instead applying the Due Process Clause of the Fourteenth Amendment, and collecting cases that analyze at what

point, short of arrest, an individual may have suffered a deprivation of personal freedom sufficient to implicate the Fourth Amendment).

Some circuits have adopted Justice Ginsburg's continuing-seizure analysis.  The United States Court of Appeals for the Fifth Circuit found a Fourth-Amendment seizure in a case where the defendant was fingerprinted, photographed, and then required to sign a personal recognizance bond, report regularly to Pretrial Services, obtain permission before leaving the state, and provide federal officers with financial and identifying information.  See Evans v. Ball, 168 F.3d 856, 860-61 (5th Cir. 1999).  The United States Court of Appeals for the Second Circuit has ruled travel restrictions and court appearances "are appropriately viewed as seizures within the meaning of the Fourth Amendment."  Murphy v. Lynn, 118 F.3d 938, 946 (2d Cir. 1997).  The United States Court of Appeals for the Third Circuit, in Gallo v. City of Philadelphia, 161 F.3d 217 (3d Cir. 1998) held that the plaintiff, who was released on bond, never arrested, detained, or handcuffed, was still seized because he was prohibited from traveling beyond New Jersey and Pennsylvania, was compelled to attend all court hearings, and had to contact Pretrial Services weekly.  See id. at 225.  The Tenth Circuit has noted that "[e]ven those courts that subscribe to the line of reasoning endorsed by Justice Ginsburg have recognized a seizure only when criminal charges are coupled with another significant restraint on liberty, such as restrictions on travel."  Becker v. Kroll, 494 F.3d at 916.

## 2. **Accrual of Fourth Amendment Malicious Prosecution Claims.**

 "A malicious prosecution claim accrues, at the earliest, when favorable termination occurs." Miller v. Spiers, No. 07-2134, 2009 U.S. App. LEXIS 17077, at *18 (10th Cir. July 27, 2009)(citing Mondragon v. Thompson, 519 F.3d 1078, 1083 (10th Cir. 2008).  See McDow v. Gonzales, No. CIV 07-1266, 2008 U.S. Dist. LEXIS 108674, at *31 (D.N.M. Sept. 30, 2008)(Browning, J.)("A § 1983 malicious prosecution claim does not mature until the plaintiff's conviction has been invalidated.").

In Miller v. Spiers, the Tenth Circuit held that the favorable termination of the plaintiff's claim occurred when the prosecutor filed a *nolle prosequi*[10] as to the criminal charges brought against the plaintiff. From that point, the statute of limitations on the plaintiff's claim begins to run and he had three years -- the applicable limitations period for civil rights actions under New Mexico law -- to file his Fourth Amendment malicious prosecution claim. See 2009 U.S. App. LEXIS 17077, at *18.

## LAW REGARDING NEW MEXICO MALICIOUS-ABUSE-OF-PROCESS CLAIMS.

The NMTCA provides a general grant of immunity from tort claims against government entities and public employees, unless a particular exception applies. See NMSA 1978 § 41-4-4(A). The NMTCA provides

> the exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

NMSA 1978 § 41-4-17. A governmental entity of New Mexico may not be sued unless the plaintiff's cause of action fits within one of the exceptions to the immunity granted to governmental entities and public employees in the NMTCA. See Begay v. State, 104 N.M. 483, 486, 723 P.2d 252, 255 (Ct. App. 1985), rev'd sub nom. on other grounds by Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (1986). The right to sue and to recover against a governmental entity is limited to the rights, procedures, limitations, and conditions that the NMTCA prescribes. See Methola v. County of Eddy, 95 N.M. 329, 333-34, 622 P.2d 234, 238-39 (1980).

The NMTCA sets out the applicable waiver of immunity for the acts or omissions of law-enforcement officers. The New Mexico statute provides in relevant part:

---

[10] A *nolle prosequi* represents a "legal notice that a . . . prosecution has been abandoned." Black's Law Dictionary 1074 (8th ed. 2004).

The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.

### 1.   NMTCA's Notice Requirement.

Under the NMTCA:

A.     Every person who claims damages from the state or any local public body under the Tort Claims Act shall cause to be presented to the risk management division for claims against the state, the mayor of the municipality for claims against the municipality, the superintendent of the school district for claims against the school district, the county clerk of a county for claims against the county, or to the administrative head of any other local public body for claims against such local public body, within ninety days after an occurrence giving rise to a claim for which immunity has been waived under the Tort Claims Act, a written notice stating the time, place and circumstances of the loss or injury.

B.     No suit or action for which immunity has been waived under the Tort Claims Act shall be maintained and no court shall have jurisdiction to consider any suit or action against the state or any local public body unless notice has been given as required by this section, or unless the governmental entity had actual notice of the occurrence. The time for giving notice does not include the time, not exceeding ninety days, during which the injured person is incapacitated from giving the notice by reason of injury.

NMSA 1978, § 41-4-16A, B.  The New Mexico Court of Appeals has explained:

[T]he purpose of a notice requirement is to enable the person or entity to whom notice must be given, or its insurance company, to investigate the matter while the facts are accessible, to question witnesses, to protect against simulated or aggravated claims, and to consider whether to pay the claim or refuse it.

Martinez v. City of Clovis, 95 N.M. 654, 657, 625 P.2d 583, 586 (Ct. App. 1980).

The plain language of NMSA 1978, § 41-4-16A and 16B does not require a notice when the

suit is against a public employee, and the New Mexico Court of Appeals has so held.  "The written

-31-

notice requirements of Section 41-4-16A do not apply to claims against public employees." Dutton

v. McKinley City Bd. of Comm'rs., 113 N.M. 51, 54, 822 P.2d 1134, 1137 (Ct. App. 1991)(citing

Martinez v. City of Clovis, 95 N.M. 654, 656, 625 P.2d 583,585 (Ct. App. 1980)).

> [T]here is nothing within the notice provisions of § 41-4-16 requiring such notice
> from one who claims damages against a public employee; and merely because
> § 41-4-4C imposes upon the governmental entity for which the employee works the
> obligation to provide a defense to its employee and pay any settlement or judgment
> reached, it does not convert a public employee, without immunity under § 41-4-6,
> into a "local public body," a "governmental entity," or the "state or state agency,"
> as those terms are defined in § 41-4-3.

Martinez v. City of Clovis, 95 N.M. at 656, 625 P.2d at 585.

### 2.    NMTCA's Statute of Limitations.

Section 41-4-15 requires that a suit seeking relief under the NMTCA be filed within two

years of the occurrence.  See Dutton v. McKinley City Bd. of Comm'rs., 113 N.M. at 53, 822 P.2d

at 1136 (citing Cozart v. Town of Bernalillo, 99 N.M. 737, 663 P.2d 713 (Ct. App. 1983)).  Section

41-4-15A states:

> Actions against a governmental entity or a public employee for torts shall be forever
> barred, unless such action is commenced within two years after the date of
> occurrence resulting in loss, injury or death, except that a minor under the full age
> of seven years shall have until his ninth birthday in which to file. This subsection
> applies to all persons regardless of minority or other legal disability.

NMSA 1978, § 41-4-15A.  "The plain language of the statute indicates when the period of

limitations begins to run." Estate of Gutierrez v. Albuquerque Police Dep't, 104 N.M. 111, 113, 717

P.2d 87, 89 (Ct. App. 1986).

### 3.    New Mexico Tort Claim of Malicious Abuse of Process.

New Mexico has combined the torts of abuse of process and malicious prosecution into a

single tort: malicious abuse of process.  See Devaney v. Thriftway Marketing Corp., 124 N.M.512,

518, 953 P.2d 277, 283 (1997), abrogated on other grounds by Fleetwood Retail Corp. of N.M. v.

LeDoux, 142 N.M. 150, 164 P.3d 31 (2007). The Supreme Court of New Mexico has held that the elements of the tort of malicious abuse of process are as follows: (i) the initiation of judicial proceedings against the plaintiff by the defendant; (ii) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (iii) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (iv) damages. See Devaney v. Thriftway Marketing Corp., 124 N.M. at 518, 953 P.2d at 283.  "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Richardson v. Rutherford, 109 N.M. 495, 501, 787 P.2d 414, 420 (1990)  The Supreme Court of New Mexico has held:

> an abuse of process arises when there has been a perversion of the court processes to accomplish some end which the process was not intended by law to accomplish, or which compels the party against whom it has been used to perform some collateral act which he legally and regularly would not be compelled to do.

Richardson v. Rutherford, 109 N.M. at 500, 787 P.2d at 419.

A malicious abuse of process claim may be asserted in two ways: (1) a "procedural irregularity" involving misuse of procedural devices such as discovery or (2) "an act that otherwise indicates the wrongful use of proceedings." Fleetwood Retail Corp. of N.M. v. LeDoux, 142 N.M. at 155, 164 P.3d at 36.  The tort of malicious abuse of process is construed narrowly to protect the right of access to the courts. See Devaney v. Thriftway Marketing Corp., 124 N.M. at 519, 953 P.2d at 284.  "[T]he filing of a proper complaint with probable cause, and without any overt misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is the result of a malicious motive."  Richardson v. Rutherford, 109 N.M. at 502, 787 P.2d at 421 ("There is no liability where the defendant has done nothing more than carry out the process to its authorized

conclusion, even though with bad intentions . . . .")(citation omitted). "[A] malicious-abuse-of-process plaintiff attempting to show a lack of probable cause must demonstrate, by the applicable standard of proof, that the opponent did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim." Devaney v. Thriftway Marketing Corp., 124 N.M. at 522, 953 P.2d at 287.

### 4.   Accrual of Malicious-Abuse-of-Process Claims.

A cause of action for malicious-abuse-of-process accrues immediately upon the improper use of process. See McDow v. Gonzales, No. CIV 07-1266, 2008 U.S. Dist. LEXIS 108674, at *44 n.5 (D.N.M. Sept. 30, 2008)(Browning, J.)("In New Mexico, a state-law claim for malicious abuse of process does not require a favorable termination before a plaintiff brings a claim, and the state statute of limitations begins to run as soon as the plaintiff knows of the facts on which he or she is basing the claim."); Harvey v. Pincus, 549 F. Supp. 332, 340 (E.D. Pa. 1982)("[A] plaintiff in a malicious abuse [of process] case need not show that the prior proceedings were terminated in his or her favor. The cause of action accrues immediately upon the improper use of process."), aff'd without op., 716 F.2d 890 (3d Cir. 1983), cert. denied, 464 U.S. 918; Norton v. Town of Islip, 04-cv-3079, 2009 U.S. Dist. LEXIS 27565, at **28-30 (E.D.N.Y. 2009)(stating that the lack of a termination requirement is what distinguishes a claim for malicious-abuse-of-process from one for malicious-prosecution and thus a malicious-abuse-of-process claim accrues as soon as criminal action is commenced).

### LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. at 807. Qualified immunity "protects federal and state

-34-

officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. Civ. 08-0181, 2009 U.S. Dist. LEXIS 45670, at *29 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Tenth Circuit has stated:

> When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden," [Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)] (internal quotation marks omitted), demonstrating, first, that the defendant's actions violated a constitutional or statutory right and, second, that the right at issue was clearly established at the time of the defendant's allegedly unlawful conduct.  In assessing whether the right was clearly established, we ask whether the right was sufficiently clear that a reasonable government officer in the defendant's shoes would understand that what he or she did violated that right. If the plaintiff fails to satisfy either part of the two-part inquiry, we must grant the defendant qualified immunity.

Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  In Saucier v. Katz, 533 U.S. 194 (2001), overruled by Pearson v. Callahan, 129 S. Ct. 808 (2009), the Supreme Court required the lowers courts to decide the issues in order, reaching the violation issue first.  In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, the court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007).  "[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must

-35-

find support in the record: more specifically, as with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." Thomson v. Salt Lake County, 584 F.3d 1304, 1312 (2009)(internal quotations and citations omitted).  The blatant contradiction of the record must be supported by more than other witnesses' testimony.  See Rhoads v. Miller, No. 08-8093, 2009 U.S. App. LEXIS 24312 (10th Cir. Nov. 5, 2009).  "The weighing of evidence, the reconciliation of inconsistent testimony, and the assessment of a witness' credibility is solely the province of the jury."  Allen v. Wal-Mart Stores, Inc., 241 F.3d 1293, 1297 (10th Cir. 2001)

Qualified immunity shields state officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. at 818.  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Strepka v. Miller, 2001 WL 1475058, at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d at 923).  See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson

-36-

v. Creighton, 483 U.S. 635, 640 (1987)).  On the other hand, as the Supreme Court has observed, it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at 640.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory."  129 S. Ct. at 818.  Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  Id.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial.  See Pearson v. Callahan, 129 S. Ct. at 819.

Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense ordinarily fails.  See Cannon v. City and County of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).  A defendant may nevertheless be entitled to immunity from suit if he can demonstrate that "extraordinary circumstances" intervened and "so 'prevented [him] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of an admittedly clearly established right.'"  Cannon v. City and County of Denver, 998 F.2d at 871 (quoting V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality, 902 F.2d 1482, 1488 (10th Cir. 1990)).

The extraordinary-circumstances exception is most frequently applicable in cases that involve reliance upon counsel.  See V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality, 902 F.2d at 1488.  "Although reliance upon counsel is not itself an extraordinary circumstance, it is a vital ingredient in cases where we have found extraordinary circumstances to exist." Hollingsworth v.

Hill, 110 F.3d 733, 740-41 (10th Cir. 1997). The Tenth Circuit has identified four factors that, when applied on a case-by-case basis, help discern when such extraordinary circumstances exist in the context of reliance on counsel: (i) how unequivocal and specifically tailored to the particular facts giving rise to the controversy, the advice was; (ii) whether complete information had been provided to the advising attorney; (iii) the prominence and competence of the attorney; and (iv) how soon after the advice was received the disputed action was taken. See V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality, 902 F.2d at 1489 (citations omitted). In Hollingsworth v. Hill, the Tenth Circuit found that the factors relevant to extraordinary circumstances favored a deputy sheriff's assertion of qualified immunity because the advice he received from an assistant district attorney was specifically tailored to the facts presented, the assistant district attorney had all the information at the deputy sheriff's disposal, and the assistant district attorney had the prominence of a county officer who was charged by statute to advise the Sheriff's Department. See Hollingsworth v. Hill, 110 F.3d at 741.

## ANALYSIS

In his motion for summary judgment, Anderson seeks dismissal of all of J. Mata's claims against him for multiple reasons. First, Anderson argues that J. Mata's First-Amendment retaliation and state tort claims fail because J. Mata released all his claims in his 2005 settlement agreement with the City of Farmington. Second, Anderson argues that J. Mata cannot establish the absence of probable cause for Anderson to bring criminal charges of criminal libel, harassment, and stalking against J. Mata. Third, Anderson contends J. Mata's Fourth Amendment claims fail because there was no seizure. Fourth, Anderson argues that even if there was no probable cause, Anderson is entitled to qualified immunity. Finally, Anderson argues that J. Mata's state tort claims fail because there was improper notice and that the statute of limitations under the NMTCA bars them.

The Court concludes that J. Mata's First-Amendment retaliation claims and state tort malicious-abuse-of-process claims accrued before November 2005 and thus J. Mata released Anderson from liability for those claims when he entered into the November 2005 settlement agreement. The Court also finds that J. Mata has shown genuine issues of material fact regarding the facts Anderson used in his determination of probable cause. The Court will grant summary judgment on the Fourth-Amendment malicious-prosecution claims, as the Tenth Circuit has rejected the notion that seizure includes restrictions imposed upon a plaintiff during his court proceedings and J. Mata did not suffer a traditional seizure. The Court also finds that there are enough facts for a jury to determine that a reasonable officer in Anderson's position would not have brought charges against J. Mata based on the information Anderson had and therefore qualified immunity is inappropriate. Finally, the Court finds that, although notice is not required, J. Mata was required to bring his state tort claims within two years of the filing of the lawsuit against him, and therefore his state tort claims are time barred. The Court, therefore, will grant Anderson's motion for summary judgment.

## I. THE NOVEMBER 2005 SETTLEMENT RELEASES ANDERSON FROM ALL CLAIMS THAT ACCRUED BEFORE NOVEMBER 2005 BUT DOES NOT RELEASE ANDERSON FROM FUTURE CLAIMS THAT ACCRUED AFTER J. MATA ENTERED THE SETTLEMENT AGREEMENT.

The release in the November 2005 settlement agreement is very broad, and Anderson is a releasee, as an employee of the City of Farmington. The scope of the release also includes non-"Action" claims. The Court finds, however, that New Mexico law would not allow J. Mata to release future intentional conduct by a police department, therefore J. Mata may bring claims for intentional conduct accruing after November 2005.

Anderson argues that J. Mata's November 2005 settlement agreement with the City of

-39-

Farmington and Farmington police officers specifically released all claims against the City of Farmington and its agents and employees, and thus J. Mata cannot now assert claims of First-Amendment retaliation and malicious abuse of process which stem from the filing of criminal charges against J. Mata in January 2005.  See Motion at 21-22.  Anderson contends that the 2005 settlement agreement releases Anderson from both the First-Amendment retaliation claims and the state tort malicious-abuse-of-process claims because they both accrued before the signing of the settlement agreement.  J. Mata argues that the 2005 settlement agreement pertained to completely separate events than the criminal charges brought against him and contends that the prosecution of the claims brought against him, and thus First Amendment retaliation, continued until he was acquitted of harassment and stalking, and until the criminal libel claim was thrown out as unconstitutional.

J. Mata and his family settled all claims arising from the November 29, 2002 arrest of J. Mata and violation of J. Mata's civil rights.  The settlement agreement was between Rene Mata, J. Mata, and Gregoria Mata, as plaintiffs, and the City of Farmington, Briseno, Officer Kenneth Clay Rayborn, Officer David Monfiles, and Officer Jerry Vigil, as defendants.  In the settlement, J. Mata and his family agreed as follows:

> Plaintiffs hereby expressly release, forever discharge, and acquit Defendants and their agents, predecessors and successors, employees, insurers, representatives and attorneys ("Released Parties") from all claims, suits, costs, debts, demands, actions and causes of action which they had or might have had against the Released Parties, arising out of or in any way related to the claims which were made or could have been made in the Action or in any way arising out of the facts or occurrences that could or did form the basis of the Action, or for any other reason including, but not limited to, any and all claims based in tort, contract, statute, ordinance, or law of any nature whatsoever, and any and all claims under any other federal, state or local statute, ordinance, or law.
>
> This Agreement therefore shall be construed to extinguish and discharge all claims included in the Action and any and all claims that Plaintiffs now have or could

hereafter assert against any of the Released Parties of any nature whatsoever.

Boognl Aff. ¶ 3, at 1 and Exhibit 1.  Anderson argues that the settlement released the City of Farmington and its employees of any claims that J. Mata had as of the date of the settlement. J. Mata argues that it would be contrary to public policy to enforce a release of claims based on future conduct, especially future violations of constitutional rights.

In the First-Amendment context, "any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom."  Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000).  On the other hand, a person can settle and/or waive a constitutional violation.  See, e.g., United States v. Salazar, 323 F.3d 852, 856 (10th Cir. 2003)(stating that a defendant's guilty plea waives all non-jurisdictional errors, including constitutional violations earlier in the proceedings).  Thus, if the settlement agreement gave up J. Mata's constitutional claims, such a contract would be valid and would not violate public policy.

A.   THE NOVEMBER 2005 SETTLEMENT AGREEMENT RELEASES J. MATA'S  CLAIMS THAT ACCRUED BEFORE HE SIGNED THE RELEASE.

The language of the release is broad.  It "expressly release[s]" and "forever discharges" the City of Farmington's "agents" and "employees."  There is no dispute that Anderson was, at all relevant times, a City of Farmington employee.  Thus, Anderson appears to be a released party. Moreover, J. Mata does not dispute that Anderson is a released party.  The scope of the release is also broad.  The settlement agreement releases Anderson "from all claims."  While the settlement agreement releases Anderson from all claims related to the "Action," the release goes further, and releases Anderson from non-Action claims -- "or for any other reason including, but not limited to, any and all claims based in tort, contract, statute, ordinance, or law of any nature whatsoever, and

-41-

any and all claims under any other federal, state or local statute, ordinance, or law." The settlement agreement then states that "[t]his Agreement therefore shall be construed to extinguish and discharge all claims included in the Action and any and all claims that Plaintiffs now have or could hereafter assert against any of the Released Parties of any nature whatsoever." Thus, the plain language releases J. Mata from asserting any claim that J. Mata could imagine. This language does not support a release of only claims asserted related to the "Action." J. Mata did not, in his written response, dispute at all that the scope of the release includes the federal constitutional and state tort claims that he brings in this case.

At the hearing, Mr. Montoya stated only: "[E]ven if sweeping[, the release] cannot include these claims because retaliation continued well after the date of the settlement. The prosecution continued all the way until Mr. Mata was acquitted on two of the counts." Tr. at 22:10-12 (Montoya). Significantly, Mr. Montoya did not argue that the parties did not "intend" for the release to cover non-"Action" claims; he stated only that the release did not cover the non-"Action" claims by Anderson. As to the argument that Mr. Montoya made, the plain language indicates that the release covers J. Mata's claims against Anderson. As to the argument that Mr. Montoya did not explicitly make, J. Mata did not introduce any evidence to show that he did not intend for the November 2005 release not to cover the events in January 2005. He did not file any affidavit. Nor did he mention <u>Mark V, Inc. v. Mellekas</u>, 114 N.M. 778 (1993) or ask for any <u>Mark V</u> hearing.[11] Hence, on the record before the Court, the only evidence that exists, or that the parties suggest exists, is the release's language. Thus, without any suggestion that there is more evidence or that a <u>Mark V</u> hearing is needed or desired, the Court will resolve the interpretation of the release on the

---

[11] According to the Supreme Court of New Mexico in <u>Mark V, Inc. v. Mellekas</u>, a district court may take extrinsic evidence to determine whether a contract is ambiguous.

record before the Court.

The Court finds that the settlement agreement precludes any claims J. Mata may have had which accrued prior to the signing of the settlement in November of 2005. There has been no evidence that the release was signed under duress. J. Mata knew or had reason to know of any harm caused to him by the released parties, including Anderson, an employee covered by the release, at the time that he signed the release and thus the claims that he knew about before he waived them are released.

### B.  THE RELEASE OF LIABILITY FROM FUTURE INTENTIONAL HARMS IS VOID UNDER NEW MEXICO PUBLIC POLICY.

J. Mata contends that Anderson continued to participate in the prosecution of his claims against J. Mata in the state district court appeal up through March of 2007, when J. Mata's jury trial ended in an acquittal on March 19, 2007.  Anderson's continued prosecution of J. Mata did not "aris[e] out of or in any way relate[] to the claims" that were the basis of the settlement in Mata v. Briseno, No. CV 04-1334 RLP/ACT, but it might fall under the scope of the non-Action claim release.  The issue is whether the parties can release future claims that a citizen may have against a police department.

As a matter of public policy, courts presume that, when parties have settled a dispute, they intended a complete accord and satisfaction of their respective claims against each other arising out of the facts underlying the explicitly settled dispute.  See Gutierrez v. Sundancer Indian Jewelry, 117 N.M. 41, 51, 868 P.2d 1266, 1276 (1993).  J. Mata argues that the intent of the November 2005 settlement agreement was to settle all claims arising out of the civil-rights action he brought against Briseno, other officers, and the City of Farmington based on his 2002 arrest.  Tr. at 21:22-25 (Montoya)("The settlement agreement pertained to completely separate actions and did not involve

actions by Officer Briseno with respect to Mr. Mata's exercise of his First Amendment claims."). J. Mata maintains that the settlement did not contemplate or anticipate a cause of action arising out of Anderson's First-Amendment retaliation against J. Mata through the prosecution of claims against him in state court.

Anderson argues that the settlement agreement's language stating "Plaintiffs now have or could hereafter assert . . . of any nature whatsoever" releases Anderson from any claims J. Mata could have asserted at the time of the settlement as well as any future claims. The settlement agreement and interpretation of the release are governed by New Mexico contract law. The New Mexico courts have not addressed whether a settlement with a governmental entity, like a police department, may release the police from liability for future conduct. New Mexico generally honors contracts, unless the contract is contrary to public policy:

> It is clearly to the interest of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts, and agreements therefore are not to be held void as being contrary to public policy, unless they are clearly contrary to what the legislature or judicial decision has declared to be the public policy, or they manifestly tend to injure the public in some way.

Berlangieri v. Running Elk Corp., 132 N.M. 332, 335-36, 48 P.3d 70, 73-74 (Ct. App. 2002); aff'd by 134 N.M. 341, 76 P.3d 1098 (2003). See United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 108 N.M. 467, 471, 775 P.2d 233, 237 (1987)("New Mexico also has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals.").

Though New Mexico courts have not addressed whether a settlement agreement, such as J. Mata's, may exculpate the police department and city from any claims of future harm, New Mexico courts have addressed exculpatory agreements by private parties, and the Court finds the Supreme Court of New Mexico's assessment of when those agreements are contrary to public policy

to be instructive.  The Supreme Court of New Mexico has stated that strict limits on the use of
exculpatory agreements best serve the interests of public policy:

> Courts have had difficulty in applying the policy against the inducement of wrongs
> to agreements by which one party is exempted from tort liability to the other. A party
> clearly cannot exempt itself from liability in tort for harm that it causes intentionally
> or recklessly. However, a party generally can exempt itself from liability or limit its
> liability in tort for harm caused by negligence, as long as the provision is not
> unconscionable.
>
> In exceptional cases, however, courts have held such an agreement unenforceable
> because the agreement affects the public interest and the other party is a member of
> the protected class.

Berlangieri v. Running Elk Corp., 134 N.M. at 350, 76 P.3d at 1107 (quoting 2 A. Farnsworth,

Farnsworth on Contracts § 5.2, at 13-14 (footnotes omitted)).  The Supreme Court of the United

States instructs that § 1983 "should be read against the backdrop of tort liability that makes a man

responsible for the natural consequences of his actions."  Malley v. Briggs, 475 U.S. 335, 345

(1986)(quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)).  See Medina v. Pacheco, No. 97-2013,

1998 U.S. App. LEXIS 22533, at *16 (10th Cir. 1993)(table)("§ 1983 claims are analogous to tort,

or personal injury, actions.").  Viewing a claim of First-Amendment retaliation against the backdrop

of tort liability, the cause of action, which requires an element of motive, resembles an intentional

tort.  Thus, New Mexico public policy instructs against permitting a party to exempt itself from

liability for harm caused by a § 1983 cause of action like First Amendment retaliation.

In analyzing the enforceability of liability waivers, the Supreme Court of New Mexico looks

at "whether the release is affected with a public interest such that it is unenforceable as contrary to

public policy."  Berlangieri v. Running Elk Corp., 134 N.M. at 352, 76 P.3d at 1109  (citation

omitted).  The Supreme Court of New Mexico uses a non-exclusive list of factors from which to

determine whether public policy should operate to void a liability release.  See Berlangieri v.

Running Elk Corp., 134 N.M. at 352, 76 P.3d at 1109.  An attempted but invalid release involves

a transaction which exhibits some or all of the these factors:

> [1] It concerns a business of a type generally thought suitable for public regulation.

> [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

> [3] The party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

> [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks its services.

> [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

> [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

Berlangieri v. Running Elk Corp., 134 N.M. at 352-53, 76 P.3d at 1109-10 (citation and internal

quotations omitted).  The Supreme Court of New Mexico stated that, "it would be possible that only

one of these factors would be applicable, but that factor would be significant enough to make the

release unenforceable."  Id., 76 P.3d at 1109-10.

Applying the same analysis to the settlement agreement J. Mata entered into with the City

of Farmington and its employees, the Court finds the second factor -- whether the party seeking

exculpation is engaged in performing a service of great importance to the public, which is often a

matter of practical necessity for some members of the public -- to be significant.  The Court can

think of no better example of a party engaged in performing a service of great importance to the

public than the police department.  The Court believes that this factor is significant enough to suggest that an agreement which releases the police department from liability for any future harm it may cause to a member of the public is contrary to New Mexico public policy.

The Court, therefore, finds that New Mexico law limits the scope of the November 2005 settlement agreement to all claims that had accrued at the time that the parties entered the settlement agreement.  J. Mata may still maintain claims which accrued after the November 2005 release was signed.

### C.   NONE OF J. MATA'S FIRST-AMENDMENT RETALIATION CLAIMS ACCRUED AFTER NOVEMBER 2005.

A § 1983 action accrues when facts that would support the cause of action are or should be apparent.  See Fratus v. Deland, 49 F.3d at 675.  "In general, under the federal discovery rule, claims accrue and [t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action."  Alexander v. Oklahoma, 382 F.3d 1206, 1215 (10th Cir. 2004).  The focus is "on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm.  In this context, a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief."  Alexander v. Oklahoma, 382 F.3d at 1216 (internal citations omitted).

Anderson contends that, if J. Mata has a viable First-Amendment retaliation claim, it accrued on the date J. Mata became aware of the alleged retaliatory conduct -- the filing of criminal charges against J. Mata, which took place on January 11, 2005.  See Reply in Support of Defendant's Motion and Brief to Dismiss Plaintiff's Complaint for Failure to Timely Serve, or in the Alternative, Motion for Judgment on the Pleadings at 4, filed July 28, 2008 (Doc. 12).  Anderson maintains that he did nothing after November 2005, and that therefore J. Mata's First Amendment retaliation claims

accrued before November 2005 and not after he entered into the settlement agreement.  As to the factual issue, the record is silent as to what Anderson did after November 2005.  The Court can infer that Anderson was likely involved in the prosecution of J. Mata after November 2005, at least as a witness, and that his involvement was necessary for the prosecution of the case.  If a police officer does not show up for state judicial proceedings, the case is often dismissed.  The magistrate judges in most areas outside of Albuquerque are non-lawyers and rely heavily on the police officers in cases before them.  Given that the case proceeded, the inference from the record is that Anderson was involved in the prosecution of the case that he began until it ended in J. Mata's acquittal.

The question is whether a new claim for First-Amendment retaliation arose from Anderson's continuing involvement in the proceedings against J. Mata, which extended past the November 2005 settlement and release agreement.  J. Mata's claims for First-Amendment retaliation accrued when he knew, or had reason to know, of the existence and cause of the injury which is the basis of his action.  See Alexander v. Oklahoma, 382 F.3d 1206, 1215 (10th Cir. 2004); Elliot Reihner Siedzikowski & Egan, P.C. v. Pa. Employees Benefit Trust Fund, 29 Fed. Appx. at 840 (holding that a First-Amendment retaliation claim accrues once a plaintiff possesses "the critical facts that he has been hurt and who has inflicted the injury.")(citation omitted); Shub v. Westchester Cmty. College, 556 F. Supp. 2d at 242-43 (stating that "[u]nder federal law a First Amendment retaliation claim accrues once a plaintiff knows or has reason to know of the injury that forms the basis of the action."); Firstline Corp. v. Valdosta -- Lowndes County Ind. Auth., 2005 U.S. Dist LEXIS 21724, at **15-16 (stating that plaintiff's First-Amendment retaliation claim accrued when "it knew it was injured and who caused the injury").  Here, J. Mata had reason to know of the existence of Anderson's retaliatory action when  allegedly unsupported criminal actions were filed against him in January 2005.  A viable claim for First-Amendment retaliation, therefore, accrued at that time.

In this regard, First-Amendment retaliation claims are more similar to New Mexico's malicious-abuse-of-process claims than they are to Fourth-Amendment malicious prosecution claims. New Mexico's malicious-abuse-of-process claim may be brought immediately, even as a counterclaim in the allegedly abusive litigation. See Devaney v. Thriftway Mktg. Corp., 124 N.M. at 521, 953 P.2d at 286 (holding that, "[b]ecause we do not recognize favorable termination as an element of a cause of action for malicious abuse of process, we hold that such a claim may be raised by counterclaim."). On the other hand, a Fourth-Amendment malicious-prosecution claim does not accrue until the plaintiff's conviction has been invalidated. See McDow v. Gonzales, 2008 U.S. Dist. LEXIS 108674, at *31. The difference in accrual dates makes sense. The Supreme Court, in Heck v. Humphrey, 512 U.S. 477 (1994), described favorable termination as an essential element of a malicious prosecution action under § 1983. See 512 U.S. at 484-86. The Supreme Court expressed concern that "to permit a convicted criminal defendant to proceed with a malicious prosecution claim would permit a collateral attack on the conviction through the vehicle of a civil suit." Id. at 484. The Tenth Circuit has decided that the favorable termination requirement is an essential element of a Fourth-Amendment malicious-prosecution claim and thus a claim never accrues until the alleged unlawful prosecution terminates in the plaintiff's favor. See Wilkins v. DeReyes, 528 F.3d at 801 n.1. On the other hand, neither a First-Amendment retaliation claim nor a New Mexico malicious-abuse-of-process claim requires a favorable termination of the underlying criminal suit. A First-Amendment retaliation claim does not pose the threat of a collateral attack on the wrongfulness of a criminal conviction; it guards against official reprisal for protected speech. See Hartman v. Moore, 547 U.S. at 256. Similarly, the gravamen of a malicious-abuse-of-process claim is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully

-49-

initiated process to illegitimate ends.  See Devaney v. Thriftway Mktg. Corp., 124 N.M. at 518, 953 P.2d at 283.

J. Mata argues that the continued prosecution represents continued retaliation, and thus he has claims which accrued until his acquittal in July of 2006.  The Tenth Circuit, however, states that, "[a]ssuming the continuing violation doctrine applies to § 1983 claims, the doctrine is triggered 'by continual unlawful acts, not by continual ill effects from the original violation.'"  Parkhurst v. Lampert, 264 Fed. Appx. 748, 749 (10th Cir. 2008)(citing Bergman v. United States, 751 F.2d 314, 317 (10th Cir. 1984)).  See Myers v. County of Somerset, 515 F. Supp. 2d at 501 n.1 ("First Amendment retaliation claims are not subject to the 'continuing violations' exception to the statute of limitations that is applicable to hostile work environment claims.").  Though J. Mata may have suffered continual ill effects from the continuing prosecution of claims against him, he has not brought forth any evidence that Anderson engaged in new retaliatory acts after the filing of the amended criminal complaint in February 2005 other than continuing the prosecution that he had started.  See Myers v. County of Somerset, 515 F. Supp. 2d at 501 n.1 ("A retaliatory act that infringes upon a plaintiff's First Amendment rights is a discrete act.")(citing O'Connor v. City of Newark, 440 F.3d at 126).

J. Mata also argues that Anderson's participation in the prosecution is enough to constitute retaliation.  J. Mata, however, did not present any evidence of Anderson's continued participation, nor did he show any discrete acts that took place after November 2005 which gave rise to claims of retaliation.  Though the Court can infer that Anderson was involved in the prosecution, the Court cannot infer from the record how Anderson was involved.  J. Mata cannot avoid summary judgment "by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838,  at * 1 (citing Fed. R. Civ. P. 56(e)

and <u>Argo v. Blue Cross and Blue Shield of Kan., Inc.</u>, 452 F.3d at 1199 (10th Cir. 2006)).  The

Court also finds persuasive the Seventh Circuit's holding  in <u>Evans v. City of Chicago</u>, 434 F.3d 916

(7th Cir. 2006).  In <u>Evans v. City of Chicago</u>, the Seventh Circuit held that the plaintiff's § 1983

claims for First-Amendment retaliation accrued on the date of injury and found that, although the

officers who had brought criminal charges against the plaintiff continued to appear in court during

his prosecution, this appearance did not constitute new unlawful acts.  <u>See</u> <u>Evans v. City of Chicago</u>,

434 F.3d at 935.  The Court agrees that appearance in the ongoing court proceedings is not enough

to give rise to a new discrete act of retaliation, especially when there has been no evidence put forth

that the appearance in court caused a new injury.

 Because J. Mata has not shown that Anderson engaged in actions after November 2005 that

constituted new, discrete acts of retaliation, the Court finds that J. Mata's claims for

First-Amendment retaliation accrued at the latest in February 2005.  The Court, therefore, finds that

the November 2005 settlement agreement released J. Mata's First Amendment retaliation claims and

the Court will grant Anderson summary judgment as to those claims for that reason.

### D. ANDERSON CONCEDES THAT J. MATA'S FOURTH AMENDMENT CLAIMS ACCRUED AFTER THE NOVEMBER 2005 SETTLEMENT AGREEMENT.

 "A malicious prosecution claim accrues, at the earliest, when favorable termination occurs."

<u>Miller v. Spiers</u>, No. 07-2134, 2009 U.S. App. LEXIS 17077, at *18 (10th Cir. July 27, 2009)(citing

<u>Mondragon v. Thompson</u>, 519 F.3d 1078, 1083 (10th Cir. 2008).  <u>See</u> <u>McDow v. Gonzales</u>, No. CIV

07-1266, 2008 U.S. Dist. LEXIS 108674, at *31 (D.N.M. Sept. 30, 2008)(Browning, J.)("A § 1983

malicious-prosecution claim does not mature until the plaintiff's conviction has been invalidated.").

J. Mata's jury trial in state district court ended in his favor on July 17, 2006, with an acquittal.  His

Fourth-Amendment malicious-prosecution claims, therefore, did not accrue until that date, which

is more than a year after J. Mata entered into the settlement agreement and release.   Indeed,

Anderson concedes that the November 2005 settlement did not release J. Mata's Fourth-Amendment

claims.  See Motion at 21.  The Court, therefore, will not grant Anderson summary judgment on the

Fourth-Amendment malicious-prosecution claims on these grounds.

### E.    J. MATA'S STATE-LAW MALICIOUS-ABUSE-OF-PROCESS CLAIMS ACCRUED BEFORE NOVEMBER 2005.

Anderson contends that J. Mata's state tort malicious-abuse-of process claims accrued once

J. Mata learned of the allegedly improper criminal charges filed against him.  J. Mata contends that

some claims[12] accrued when J. Mata was acquitted in the state district court.  To assert a claim of

malicious-abuse-of-process, Mata must show: (i) the initiation of judicial proceedings against him

by Anderson; (ii) an act by Anderson in the use of process other than such as would be proper in the

regular prosecution of the claim; (iii) a primary motive by Anderson in misusing the process to

accomplish an illegitimate end; and (iv) damages.  See Devaney v. Thriftway Marketing Corp., 124

N.M. at 518, 953 P.2d at 283.   "[P]rior favorable termination is not an element of the malicious

abuse of process tort, as it was for the former tort of malicious prosecution."  Fleetwood Retail Corp.

v. LeDoux, 142 N.M. at 154, 164 P.3d at 35.  A cause of action for malicious abuse of process

accrues when a party knows or has reason to know of the injury that constitutes the basis of the

action.  A cause of action for malicious-abuse-of-process accrues immediately upon the improper

use of process.  See McDow v. Gonzales, No. CIV 07-1266, 2008 U.S. Dist. LEXIS 108674, at *44

---

[12]   In the hearing, Mr. Montoya stated that "the first bringing of the charge we don't think is the completion of the state common law tort of malicious prosecution, and so some portion may be eliminated under a two-year statute, but we brought this action within two years of Juan Mata's acquittals on those charges and, therefore, we feel that it is timely under the common law."  Tr. at 31:25-32:6 (Montoya).  Mr. Montoya did not expand upon what he meant by "some portion" of the malicious-abuse-of-process claim.

n.5 (D.N.M. Sept. 30, 2008)(Browning, J.)("In New Mexico, a state-law claim for malicious abuse of process does not require a favorable termination before a plaintiff brings a claim, and the state statute of limitations begins to run as soon as the plaintiff knows of the facts on which he or she is basing the claim."); <u>Harvey v. Pincus</u>, 549 F. Supp. at 340 ("[A] plaintiff in a malicious abuse [of process] case need not show that the prior proceedings were terminated in his or her favor.  The cause of action accrues immediately upon the improper use of process."); <u>Norton v. Town of Islip</u>, 2009 U.S. Dist. LEXIS 27565, at **28-30 (stating that the lack of a termination requirement is what distinguishes a claim for malicious-abuse-of-process from one for malicious-prosecution and thus a malicious-abuse-of-process claim accrues as soon as criminal action is commenced).  The accrual of the claim immediately upon improper use of process is in line with when similar constitutional torts accrue -- when a party knows or has reason to know of the injury that constitutes the basis of the action.

In this case, J. Mata's malicious-abuse-of-process claim accrued when Anderson filed criminal charges against him, allegedly without probable cause.   Upon receiving the criminal complaint in January 2005, J. Mata was aware of Anderson's allegedly malicious motives.  In the hearing, Mr. Montoya stated that the "greatest telltale sign of malicious intent" and "malicious motive" is Anderson's Statement of Probable Cause bearing Anderson's signature.  Tr. at 25:14-17 (Montoya); <u>id.</u> at 31:19-21 (Montoya).  J. Mata has not presented evidence of subsequent abuse of process separate from the initiation of the criminal actions by Anderson.  The Court finds, therefore, that, because J. Mata has asserted a claim of malicious-abuse-of-process that accrued in January 2005, he released these claims when he entered into the November 2005 settlement agreement.  The Court, thus, will grant Anderson's motion for summary judgment on the state-tort claims.

**II.    THE COURT CANNOT DETERMINE AT THIS TIME, AS A MATTER OF LAW, THAT ANDERSON'S LAWSUIT AGAINST J. MATA WAS BASED ON PROBABLE CAUSE.**

Probable cause at least presupposes that there be reasonable and particularized grounds for belief that a suspect is guilty of some crime. See Maryland v. Pringle, 540 U.S. 366, 371 (2003)("The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, . . . , and that the belief of guilt must be particularized with respect to the person to be searched or seized . . . ."). "Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent [officer] in believing that an offense has been or is being committed." Karr v. Smith, 774 F.2d at 1031. See State v. Copeland, 105 N.M. 27, 31, 727 P.2d 1342, 1346 (Ct. App. 1986). Alternatively stated, there is no probable cause if a reasonable officer knew or should have known that there was not probable cause to bring criminal charges. See Wilkens v. DeReyes, 528 F.3d 790 (10th Cir. 2008)(finding that, where plaintiff alleged that the information in officers' probable cause statement was fabricated, "[u]nder the version of the facts presented by Plaintiffs and accepted by the district court on summary judgment . . . a reasonable officer should have known no probable cause existed without the statements."); Harris v. Bornhorst, 513 F.3d 503, 513 (6th Cir. 2008) (holding that the district court erred in concluding that an officer had probable cause because the officer should have known that the confession she relied upon was suspect). This standard is an objective one; the subjective belief of an individual officer whether there is probable cause is not dispositive. See United States v. Davis, 197 F.3d 1048, 1051 (10th Cir. 1999).

In determining whether an officer has sufficient reasonably trustworthy information to constitute probable cause, clearly established case law requires officers to look at the "totality of the circumstances." United States v. Morgan, 936 F.2d 1561, 1569 (10th Cir. 1991); United States v.

Fox, 902 F.2d 1508, 1513 (10th Cir. 1990).  "While officers may weigh the credibility of witnesses in making a probable cause determination, they may not ignore available and undisputed facts." Baptiste v. J.C. Penney, 147 F.3d 1252, 1259 (10th Cir. 1998).  See Romero v. Fay, 45 F.3d 1472, 1476-77 & n.2 (10th Cir. 1995)(noting that, while officers do not have duty to interview alleged alibi witness once probable cause is established, the probable-cause standard "requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed"); Clipper v. Takoma Park, Md., 876 F.2d 17, 19-20 (4th Cir. 1989)(sustaining jury verdict that police officer lacked probable cause to arrest plaintiff because officer relied on speculative information while ignoring readily available exculpatory evidence); Bevier v. Hucal, 806 F.2d, 123 128 (7th Cir. 1986)(stating that a "police officer may not close her or his eyes to facts," and that "reasonable avenues of investigation must be pursued"); Moore v. Marketplace Restaurant, Inc., 754 F.2d 1336, 1345-47 (7th Cir. 1985) (officers' failure to interview plaintiffs to determine if offense had been committed at all before arresting them for theft of restaurant services presented jury question whether facts supplied probable cause to arrest).

According to the Amended Statement of Probable Cause (executed January 31, 2005), filed October 19, 2009 (Doc. 35-8), the reasons for Anderson's probable cause to bring charges of criminal libel, harassment, and stalking were: (i) the letter from Adamson, "which was written on behalf of Juan Mata;"  which "falsely and with actual malice accused Officer Mike Briseno" of eleven felonies; (ii) the petition signed by 188 individuals alleging unlawful searches and seizures by Briseno; and (iii) J. Mata picketing in front of the City of Farmington Police Department. Anderson contends that this information, in addition to the interoffice memoranda from Briseno reporting that he learned from J. Mata's ex-wife Maritza Torres that J. Mata had bragged about

hiring a Mexican national to "take out" Briseno and that J. Mata had learned personal information about Briseno from a private investigator with whom J. Mata is friends suggested probable cause. See Anderson Aff. Exhibits 3 and 4.[13]

J. Mata has brought claims against Anderson for First-Amendment retaliation, Fourth-Amendment malicious prosecution, and state tort claims of malicious abuse of process. J. Mata must show that there are genuine issues of material fact to survive summary judgment on each of these claims. Anderson contends that, because lack of probable cause is an essential element in all of them, the Court should grant him summary judgment because J. Mata cannot show a genuine issue of material fact that Anderson lacked probable cause.

The Court previously found that conviction by the state magistrate court is not conclusive evidence of probable cause. See Memorandum Opinion and Order at 55. Though the Court recognizes that the conviction by the magistrate court lends some weight to a finding of probable cause, the Court does not believe that this evidence trumps the genuine issues of material fact that Anderson lacked probable cause.

### A. LACK OF PROBABLE CAUSE IS AN ESSENTIAL ELEMENT OF J. MATA'S FIRST-AMENDMENT AND FOURTH-AMENDMENT CLAIMS.

To sustain a claim for First-Amendment retaliatory prosecution, J. Mata must allege and prove: (i) that he was engaged in a constitutionally protected activity; (ii) that Anderson's action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) that Anderson's action was substantially motivated as a response to his exercise of his First Amendment speech rights. See Becker v. Kroll, 494 F.3d at 925 (citing

---

[13] Anderson did not include the information contained in the memoranda from Briseno in his Amended Statement of Probable Cause filed with his criminal complaint against J. Mata.

Worrell v. Henry, 219 F.3d at 1212).  He also must plead and prove the absence of probable cause

for the prosecution.  See Becker v. Kroll, 494 F.3d at 925 (citing Hartman v. Moore, 126 S.Ct. at

1707).  Anderson argues that he is entitled to summary judgment on J. Mata's First-Amendment

claims because J. Mata has failed to show that there is a genuine issue of material fact whether there

was an absence of probable cause, the fourth essential element of his claim.

        To sustain a Fourth-Amendment malicious-prosecution claim, J. Mata must prove the

following elements: (i) that Anderson caused J. Mata's continued confinement or prosecution;

(ii) the original action brought by Anderson terminated in favor of J. Mata; (iii) no probable cause

supported the original confinement or prosecution; (iv) Anderson acted with malice; and (v) J. Mata

sustained damages.  See Wilkins v. DeReyes, 528 F.3d at 799.  In a Fourth-Amendment

malicious-prosecution case, "the third element deals only with the probable cause determination

during the institution of legal process . . . ."  Id.  Anderson has challenged J. Mata's ability to

establish the third element of Fourth Amendment malicious prosecution, the showing of lack of

probable cause.

        If the Court finds that J. Mata fails to present a genuine issue of material fact that Anderson

lacked probable cause to bring claims of criminal libel, harassment, and stalking, the Court should

grant Anderson's motion for summary judgment.  The Court, however, believes that J. Mata has

presented sufficient evidence to prevent a finding, as a matter of law, that Anderson had probable

cause.

**B.    THE EVIDENCE SHOWS GENUINE ISSUES OF MATERIAL FACT
        WHETHER THERE WAS PROBABLE CAUSE TO BRING CRIMINAL
        CHARGES AGAINST J. MATA.**

        The Court believes that there is sufficient evidence on the record to demonstrate genuine

issues of material fact whether probable cause supported Anderson's actions.  "[W]here there is a

question of fact or room for a difference of opinion about the existence of probable cause, it is a proper question for a jury."  Bruner v. Baker, 506 F.3d 1021, 1028 (10th Cir. 2007)(quoting DeLoach v. Bevers, 922 F.2d 618, (10th Cir. 1990)).  J. Mata has presented evidence that raises questions about the validity of the assertions in Anderson's Amended Statement of Probable Cause and leaves room for a difference of opinion about the facts that led to Anderson's probable-cause determination.

J. Mata submitted the affidavit of Alice Atencio, one of the signers of the petition who represents that she has personal knowledge of Briseno's unlawful actions and who was interviewed during Internal Affairs' investigation into the petition.  See Atencio Aff. ¶ 3, at 1; Anderson Aff. Exhibit 1 at 7-8.  He also submitted the affidavit of Cummings, Adamson's employee, who states that he and Adamson drafted the letter which Anderson says shows that J. Mata was acting falsely and with actual malice towards Briseno.  Cummings states that J. Mata had no knowledge of the letter until after it was sent, nor was the choice to send a letter discussed with J. Mata.  See Cummings Aff. ¶¶ 15-16, at 2.  Cummings also states that he has personal knowledge of a private investigator keeping Briseno under surveillance and personal knowledge that Mata did not hire the investigator.  See Cummings Aff. ¶¶ 63-64, at 7.  J. Mata also submitted Nagl's affidavit containing a party admission by Anderson requesting a copy of the New Mexico statutes and stating "Oh. Juan Mata. There's got to be something in here. He's not going to get away with this."  Nagl Aff. ¶ 2, at 2.

### 1.    **Criminal Libel**.

The New Mexico criminal libel statute, NMSA 1978, Section 30-11-1, reads in its entirety:

Libel consists of making, writing, publishing, selling or circulating without good motives and justifiable ends, any false and malicious statement affecting the

reputation, business or occupation of another, or which exposes another to hatred, contempt, ridicule, degradation or disgrace.

Whoever commits libel is guilty of a misdemeanor.

The word "malicious," as used in this article, signifies an act done with evil or mischievous design and it is not necessary to prove any special facts showing ill-feeling on the part of the person who is concerned in making, printing, publishing or circulating a libelous statement against the person injured thereby.

    A.    A person is the maker of a libel who originally contrived and either executed it himself by writing, printing, engraving or painting, or dictated, caused or procured it to be done by others.

    B.    A person is the publisher of a libel who either of his own will or by the persuasion or dictation, or at the solicitation or employment for hire of another, executes the same in any of the modes pointed out as constituting a libel; but if anyone by force or threats is compelled to execute such libel he is guilty of no crime.

    C.    A person is guilty of circulating a libel who, knowing its contents, either sells, distributes or gives, or who, with malicious design, reads or exhibits it to others.

    D.    The written, printed or published statement to come within the definition of libel must falsely convey the idea either:

      (1)    that the person to whom it refers has been guilty of some penal offenses;

      (2)    that he has been guilty of some act or omission which, though not a penal offense, is disgraceful to him as a member of society, and the natural consequence of which is to bring him into contempt among honorable persons;

      (3)    that he has some moral vice or physical defect or disease which renders him unfit for intercourse with respectable society, and as such should cause him to be generally avoided;

      (4)    that he is notoriously of bad or infamous character; or

      (5)    that any person in office or a candidate therefor is dishonest and therefore unworthy of such office, or that while in office

he has been guilty of some malfeasance rendering him unworthy of the place.

      E.      It shall be sufficient to constitute the crime of libel if the natural consequence of the publication of the same is to injure the person defamed although no actual injury to his reputation need be proven.

      F.      No statement made in the course of a legislative or judicial proceeding, whether true or false, although made with intent to injure and for malicious purposes, comes within the definition of libel.

NMSA 1978 § 30-11-1. The statute was enacted in 1963, one year before the Supreme Court of the United States's decision in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), which created a qualified privilege to make defamatory statements relating to the official conduct of a public official. The New Mexico Court of Appeals has found that the privilege extends to protection from prosecution for criminal libel. See State v. Powell, 114 N.M. 395, 397-98, 839 P.2d 139, 141-42 (Ct. App. 1992)(discussing New York Times Co. v. Sullivan, 376 U.S. at 279-80). The New Mexico Court of Appeals in State v. Powell, held that § 30-11-1 is unconstitutional as applied to a charge of libel predicated on public statements that involve matters of public concern. See 114 N.M. at 403, 839 P.2d at 147. In that decision, the Court of Appeals found that a university teacher could not be prosecuted for criminal libel under § 30-11-1 because the New Mexico Constitution prohibits a conviction of criminal libel for public defamation made without actual malice on a matter of public concern. A statement is made with "actual malice" if it is made "with knowledge that it [is] false or with reckless disregard of whether it [is] false or not." New York Times Co. v. Sullivan, 376 U.S. at 280. The New Mexico Court of Appeals found, however, that the language of § 30-11-1 does not contain a statutory definition equivalent to actual malice. The Court of Appeals stated:

In short, we have no power to revise the language of the New Mexico criminal libel statute and insert an element of the offense that has not been present since the statute's initial enactment more than a century ago. We hold that Section 30-11-1

is unconstitutional as applied to a charge of libel predicated on public statements that involve matters of public concern.

114 N.M. at 403, 839 P.2d at 147.

Anderson contends that there was probable cause to bring charges of criminal libel against

J. Mata. The Amended Criminal Complaint alleged that J. Mata committed criminal libel when he:

> By means of a written document directed to the Chief of Police of Farmington, New Mexico, knowingly ma[de], publish[ed] and circulate[d] without good motives or justifiable ends and with actual malice a writing falsely accusing Officer Michael Briseno, City of Farmington Police Department, of the following:
>
> 1)    Being guilty of several penal offenses;
>
> 2)    Being guilty of acts which were disgraceful to him as a member of society and were intended to bring Officer Briseno into contempt among honorable persons; and
>
> 3)    Being of bad or infamous character.

Amended Criminal Complaint, Anderson Aff. Exhibit 7, at 3. According to the Amended Statement of Probable Cause, there was probable cause for the criminal libel charge based on the letter from Adamson, on J. Mata's filing of a citizen complaint which contained a petition about Briseno violating the civil rights of citizens, and based on J. Mata's picketing at the Farmington Police Department.

The actions that Anderson contends were unlawful fall within the scope of public statements that involve matters of public concern. Indeed, the state district court found the charge of criminal libel unconstitutional when J. Mata appealed the magistrate court's decision. J. Mata argues that although officers may generally rely on the validity and constitutionality of laws passed by the legislature, but that they may not rely on laws "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see [their] flaws." Michigan v. DeFillippo, 443

U.S. 31, 38 (1979).  Additionally, "[p]olice are charged to enforce the laws until and unless they are declared unconstitutional."  Id.

The Criminal Complaint alleges that J. Mata's submission of a petition requesting an investigation into alleged unlawful searches and seizures constitutes criminal libel because it falsely accuses Briseno.  Internal Affairs' investigation report found the allegations in the petition unsustained, because Internal Affairs could not adequately investigate the allegations.  See Anderson Aff. Exhibit 1 at 9.  The investigation report also contains interviews, however, with signers of the petition who had experienced or had personal knowledge of possible civil rights violations by Briseno.  See Interview with Mr. Joe Sena, Interview of Ms. Isabel Arroyo, Interview with Ms. Maria Martinez (a/k/a Maria Mata), Anderson Aff. Exhibit 1 at 3, 4, 7, 8.  Atencio's affidavit also shows a genuine issue of material fact about the validity of the allegations contained in the petition.  The Court finds that, presented with the investigation into the petition that the Amended Criminal Complaint alleges was libelous, as well as the information in Atencio's affidavit, a reasonable jury could find that Anderson ignored some facts and prosecuted J. Mata because of the petition.  The letter that Cummings wrote and that Adamson signed, which spurred another Internal Affairs' investigation report, along with Cummings' affidavit, also raises genuine issues of material fact.  Although Anderson may not have known that Cummings penned the letter to the Farmington Police Department, the investigative report, completed in October of 2004, states in the narrative that: "On September 9, 2004, I received a letter from the office of local attorney Ronald R. Adamson, requesting an administrative investigation regarding Officers Kent O'Donnell and Mike Briseno."  Anderson Aff. Exhibit 4 at 2.  The narrative also states that Internal Affairs contacted Adamson, not J. Mata, to obtain a copy of the videotape Adamson's previous letter had indicated existed.  See id.  This information comports with Cummings' affidavit, which states: "Nowhere in

-62-

the letter did Mr. Adamson claim that he was sending the letter at Mr. Mata's request," and "To my knowledge, Mr. Mata had no knowledge of the letter until after it was sent.  Cummings Aff. ¶¶ 13, 16, at 2.  There is a genuine issue of fact whether a reasonable officer would have made the same conclusions as Anderson concerning who was responsible for the letter.  A reasonable investigation by Anderson into the nature of the allegedly libelous letter -- information that was easily accessible through Internal Affairs in the three months that passed between the completion of Internal Affairs' investigation and Anderson's filing of his complaint -- before bringing criminal charges against J. Mata, could have revealed that not only did J. Mata not write the letter, but also that he did not request it be submitted.  See Baptiste v. J.C. Penney, Co., 147 F.3d at 1259 ("[P]olice officers may not ignore easily accessible evidence . . .").  There is also no evidence that Anderson could not have gathered the information from Internal Affairs if he had asked.  Taking the facts in the light most favorable to J. Mata -- that Anderson ignored evidence that the letter was Adamson's and not J. Mata's -- a reasonable jury could find that there was not probable cause to bring criminal libel charges against J. Mata because of the letter.

        Although there are genuine issues of material fact regarding the petition and the letter, J. Mata has not shown that there are genuine issues of material fact regarding his protesting with signs outside of the Farmington Police Department on October 28, 2004.  "[W]hile probable cause is usually a question for the jury, a court should decide it when there is no genuine issue of material fact."  Bruner v. Baker, 506 F.3d 1021, 1028 (10th Cir. 2007).  Anderson charged J. Mata with criminal libel for holding up signs criticizing Briseno.  The Court finds that such activity constituted public statements involving a matter of public concern -- the possible misconduct of a police officer, charged with a duty to protect the public.  The Court of Appeals of New Mexico has held that speech of that character is protected speech and cannot give rise to criminal libel charges.  See State v.

Powell, 114 N.M. at 403, 839 P.2d at 147.  The Court finds that Anderson did not have probable cause to charge J. Mata with criminal libel for exercising his right to long-established protected speech.  It remains a question of fact for a jury, however, whether the petition and the letter support Anderson's finding of probable cause for the criminal libel charge.

### 2.     Harassment.

Harassment requires proof that a person knowingly pursued "a pattern of conduct that is intended to annoy, seriously alarm or terrorize another person" to the extent that a reasonable person would "suffer substantial emotion distress."  NMSA 1978, § 30-3A-2.  The Amended Criminal Complaint alleges that J. Mata committed harassment when:

> on or about May 12, 2003, September 9, 2004, and October 28, 2004 . . . Juan Mata did knowingly pursue a pattern of conduct that was intended to annoy, seriously alarm or terrorize Farmington Police Officer Michael Briseno and that such actions served no lawful purpose and the conduct was such that it caused Officer Michael Briseno to suffer substantial emotional distress.

Amended Criminal Complaint, Anderson Aff. Exhibit 7, at 3.  The Amended Statement of Probable Cause lists only the petition, the letter from Adamson, and J. Mata's picketing.  Anderson's affidavit, however, also contends that he relied on Briseno's memoranda relaying information he heard from J. Mata's ex-wife about an alleged Mexican national hired to kill Briseno and information about a private investigator.  The Court looks at whether, considering the totality of the circumstances, the facts within Anderson's knowledge raise "questions of fact or room for a difference of opinion about the existence of probable cause" for a jury to determine.  Bruner v. Baker, 506 F.3d 1028.

The Court finds that, presented with the Amended Statement of Probable Cause, Anderson's affidavit, and Cummings' affidavit, there are genuine issues of fact whether the three alleged actions -- the filing of the petition, Adamson's letter requesting an investigation, and J. Mata's picketing --

gave rise to a reasonable belief that J. Mata was acting with the intention to annoy, seriously alarm, or terrorize Briseno.  As a matter of law, the picketing in front of the police department is a protected First Amendment right, and the Court finds that there was no probable cause to bring criminal harassment claims against J. Mata for that activity.  See Saxe v. State College Area Sch. Dist., 240 F.3d 200, 206 (3d Cir. 2001)("There is of course no question that non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause.  But there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive . . . .").

Genuine issues of material fact exist regarding what Anderson knew about the petition and the letter.  There is a factual issue concerning to what extent Anderson improperly implicated J. Mata for the letter written by Adamson.  J. Mata has shown evidence that he did not write the letter alleging felonies committed by Briseno, and there is evidence that he did not even know about the letter until after it had been sent by Adamson and Cummings.  Although Anderson may not have had the knowledge contained within Cummings' Affidavit when he filed criminal charges against J. Mata, he had within his knowledge the information contained within the investigation report.  The Internal Affairs investigative report states that Adamson sent the letter to the Farmington Police Department and that Internal Affairs requested a videotape of the incident giving rise to the letter from Adamson, not from J. Mata.  The extent to which Anderson improperly imputed responsibility for Adamson's letter based on what he knew or could have reasonably found out with basic investigation before filing criminal charges is a genuine issue of fact, and is significant to a determination whether it was then reasonable to claim that the letter evidences J. Mata's intent to annoy, seriously alarm, or terrorize Briseno.  Taking the facts in the light most favorable to J. Mata, Anderson knew or should have known that Adamson was responsible for the letter, not J. Mata, and

thus, a reasonable jury could find a reasonable officer could not have found probable cause for a harassment charge against J. Mata because of the letter. Also, viewing the facts in the light most favorable to J. Mata, the petition was signed by Farmington citizens with valid complaints against Briseno, and a reasonable jury could find that it did not give rise to probable cause for harassment charges against J. Mata. The claims in the petition may have been true, as the Internal Affairs investigation did not determine that the petition's claims were false; rather, the complaint was designated unsustained because Internal Affairs concluded it was unable to investigate the allegations. Accordingly, Anderson's determination that the petition constituted harassment may have been unreasonable, and the issue of probable cause is one for the jury to decide.

Although probable cause is determined by facts within the officer's knowledge, see Karr v. Smith, 774 F.2d at 1031, the Amended Criminal Complaint charges J. Mata only with harassment for his actions on May 12, 2003 (date the petition was delivered), September 9, 2004 (date Adamson's letter was delivered), and October 28, 2004 (picketing).[14] Anderson only charged

---

[14] The Court is concerned that Anderson did not include the information he learned from the memoranda in his Amended Statement of Probable Cause. The Tenth Circuit has previously found that plaintiffs satisfied the absence of probable cause element of their malicious process claim when the information stating probable cause in the arrest-warrant application was allegedly fraudulent and the officers did not come forward with additional information they allegedly relied upon for determining probable cause until plaintiffs brought malicious prosecution claims against the officers. See Wilkins v. DeReyes, 528 F.3d at 802. The Tenth Circuit stated:

But because the officers revealed none of the additional information during the institution of legal process -- in this case, during the arrest warrant applications -- the officers cannot use this information to escape liability. If institution of legal process is required to trigger a malicious prosecution claim, we ought not search for probable cause in a pile of unrevealed information. The Fourth Amendment in the context of a malicious prosecution claim deals with judicial determinations of probable cause, either at the warrant application stage or during a Gerstein hearing following a warrantless arrest. Judicial determination becomes a misnomer if information required to support probable cause remains at all times firmly lodged in the officer's head. See Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 565 n.8

J. Mata with harassment for the activities on three specific dates, however, he argues that he based his finding of probable cause on memoranda from Briseno.  Anderson states that he relied on the memoranda alleging behavior which he viewed as harassing; however, there is no evidence that he verified the trustworthiness of the information Briseno was receiving second-hand from J. Mata's ex-wife.  The probable cause standard requires an officer, such as Anderson, to investigate basic evidence and to inquire if a crime has been committed.  See Romero v. Fay, 45 F.3d at 1476-77; Bevier v. Hucal, 806 F.2d at 128 (stating that a "police officer may not close her or his eyes to facts" and that "reasonable avenues of investigation must be pursued").  It is a genuine issue of material fact whether it was reasonable for Anderson to rely on Briseno's memoranda without any further investigation.   A reasonable jury could find that it was objectively unreasonable for Anderson to rely on facts with questionable trustworthiness that he did not verify.  In a case like this one, where Anderson was not making a quick decision under pressure, such as a warrantless arrest, but rather had time to investigate, a reasonable jury could find that his failure to do so made his determination of probable cause unreasonable.  Also, a jury might determine he did not rely upon Briseno's memoranda at all, because charging J. Mata with the misdemeanor offense of stalking, and not

---

(1971)("[A]n otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. . . . A contrary rule would, of course, render the [legal process] requirements of the Fourth Amendment meaningless.").

Wilkins v. DeReyes, 528 F.3d at 802.  In the Amended Statement of Probable Cause, Anderson made a general reference to other information when he stated: "The foregoing incident is one of several prior or subsequent incidents which illustrate a course or pattern of conduct committed with actual malice and disregard for the truth by the Defendant for the purpose of seeking Officer Briseno's dismissal from the Farmington Police Department."  Anderson Aff. Exhibit 7, at 2. Accordingly, the Court will review Anderson's determination of probable cause based upon all the facts within his knowledge, and not based only on what he specifically listed in his Amended Statement of Probable Cause.  See Karr v. Smith, 774 F.2d at 1031.

-67-

arresting him for a more serious crime or providing protection for Briseno, would be an unreasonable response to learning he was attempting to kill a police officer.[15]

### 3.   Stalking.

A person commits stalking if he or she follows another person, places another person under surveillance, or harasses another person in such a way as to place that person in reasonable apprehension of death, bodily harm, sexual assault, confinement, or restraint, or to cause a reasonable person to fear for the person's safety or the safety of a household member.  See NMSA 1978, § 30-3A-3.  The Amended Criminal Complaint alleges that J. Mata committed stalking when:

> on or about May 12, 2003, September 9, 2004, and October 28, 2004 . . . Juan Mata did knowingly pursue a pattern of conduct that caused Farmington Police Officer Michael Briseno to feel frightened, intimidated or threatened and to fear for his safety and the safety of a household member and that said defendant Juan Mata committed, on more than one occasion, harassment of Officer Briseno.

Amended Criminal Complaint, Anderson Aff. Exhibit 7, at 4.  The charge of stalking is based on the same conduct as the charge for harassment.  Although Anderson only brought charges arising out of the petition, the letter from Adamson, and the picketing, a probable-cause determination looks at the totality of the circumstances known to Anderson.  J. Mata has brought forth evidence calling into question the veracity of the information that Anderson contends supported his filing of criminal charges.  In determining whether there was probable cause when there are issues of fact regarding the information an officer relied upon, the jury must determine whether the officer relied on reasonably trustworthy information sufficient to warrant a prudent officer to believe that an offense

---

[15] At the hearing, Anderson's attorney stated that the police department did other things to protect Briseno.  See Tr. at 42:15-25 (Langenwalter).  The record does not, however, contain mention in the pleadings or in the evidence of other actions other than the misdemeanor charges brought against J. Mata.  Counsel's contention that other actions were taken, heard for the first time at the hearing, does not vitiate the genuine issue of fact that J. Mata has shown.

had been committed. See Karr v. Smith, 774 F.2d at 1031.   According to Anderson's affidavit, the information he had about any alleged stalking was third hand, given to him by Briseno through a conversation Briseno had with J. Mata's ex-wife, relaying a conversation she allegedly had with J. Mata.  Without investigation of basic evidence, the jury could find that a reasonable officer would not have relied on the information Anderson contends formed the basis of his probable cause. Viewing the facts in the light most favorable to J. Mata, the information in Briseno's memoranda was either fabricated or based upon unreliable information, and a jury could find that a reasonable officer would not have found probable cause to charge J. Mata with stalking based upon the memoranda.  The Court finds, therefore, that J. Mata has raised genuine issues of material fact whether Anderson had probable cause to charge J. Mata with stalking.

### C.   J. MATA HAS PRESENTED EVIDENCE OF LACK OF PROBABLE CAUSE TO SUPPORT A CLAIM FOR MALICIOUS ABUSE OF PROCESS BUT HAS NOT SHOWN A GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER THERE WAS PROCEDURAL IMPROPRIETY.

The Supreme Court of New Mexico defines the elements of malicious abuse of process as: (i) the initiation of judicial proceedings against the plaintiff by the defendant; (ii) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (iii) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (iv) damages.  See  Devaney v. Thriftway Marketing Corp., 124 N.M. at 518, 953 P.2d at 283.  "The second element -- misuse of process -- can be shown in one of two ways: (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment."  Fleetwood Retail Corp. v. LeDoux, 142 N.M. 155, 164 P.3d 31, 35 (2007)(internal quotation omitted).  J. Mata's Second Amended Complaint asserts his malicious-abuse-of-process claims under both the lack-of-probable-cause theory and the improper-procedure theory.  In his

response, J. Mata argues that his state-law claims do not require a showing that there was no probable cause to charge him.    J. Mata argues that "[t]here is ample evidence that the process against [J. Mata] was so perverted and [J. Mata's] state law claim should survive [Anderson's] motion.  Anderson contends that J. Mata has not supported the allegation of procedural impropriety. The Court finds that J. Mata has not shown a genuine issue of material fact whether Anderson engaged in procedural impropriety, which may satisfy the second prong of his malicious abuse of process claim.  The Court finds, however, that J. Mata has met his burden of demonstrating genuine issues of material fact whether Anderson lacked probable cause.

### 1.        J. Mata Has Not Shown a Genuine Issue of Material Fact Establishing Misuse of Process By Irregularity or Impropriety.

J. Mata contends that his state-law claims do not require a showing of a lack of probable cause, but rather he may show procedural impropriety, and states that "[t]here is ample evidence that the process against [J. Mata] was so perverted and [J. Mata's] state law claim should survive Defendant's motion."  Response at 12.  The second general method of demonstrating a misuse of process, rather than a showing of lack of probable cause,  is through some irregularity or impropriety suggesting extortion, delay, or harassment.  See Devaney v. Thriftway Mktg., 124 N.M. at 522, 953 P.2d at 287.  "A procedural impropriety under the tort of malicious abuse of process might arise if there was an improper use of criminal or civil process in a manner not contemplated by law." Weststar Mortg. Corp. v. Jackson, 133 N.M. 114, 124, 61 P.3d 823, 833 (2002).  "There is no liability when the defendant in an abuse of process claim has done nothing more than carry out the process to its authorized conclusion, even if done with bad intentions."  Id.  Anderson argues that J. Mata offered nothing more than conclusory allegations of procedural impropriety and fails to cite with particularity those portions of the record upon which he relies for the proposition that there is

ample evidence that the process against J. Mata was perverted.  See Reply at 11 (citing D.N.M. LR-CV 56(b)).  Anderson is correct that J. Mata did not identify any specific evidence for the Court to support his contention that there is "ample evidence" of procedural impropriety.  J. Mata has offered only a party admission from Anderson, via Nagl's affidavit, stating "There's got to be something in here. He's not going to get away with this."  See Nagl Aff. ¶ 2 at 2.  Although this admission may show that Anderson had "bad intentions," without more, it does not create a genuine issue of fact whether there was procedural impropriety.

### 2.    J. Mata Has Met His Burden of Showing Genuine Issues of Material Fact Regarding a Lack of Probable Cause.

To demonstrate the overt act required in an action for malicious abuse of process, J. Mata may show that Anderson filed an action against him without probable cause.  See Devaney v. Thriftway Mktg. Corp., 124 N.M. at 520, 953 P.2d at 285.  "Probable cause in the malicious abuse of process context is defined as a reasonable belief, founded on known facts established after a reasonable pre-filing investigation that a claim can be established to the satisfaction of a court or jury."  Id., 953 P.2d at 285.[16]  When assessing whether J. Mata has met his burden to show that

_____

[16] The Supreme Court of New Mexico adopted this definition of probable cause from rule 11 of the Federal Rules of Civil Procedure and the Restatement (Second) of Torts § 675.  The Court notes that § 675 addresses determinations of probable cause to bring civil proceedings.  The related provision for probable cause to bring criminal charges is Restatement (Second) of Torts § 662.  A comment to § 675 states:

> [A] private prosecutor's reasonable belief in the guilt of the accused differs from the reasonable belief of one who initiates private civil proceedings against another.  A private prosecutor does not have reasonable grounds for believing that the accused has conducted himself in a particular manner, if he merely entertains a suspicion even though he reasonably believes it may be verified upon further investigation.  See Comment (c) on § 662.  On the other hand, when the proceedings are civil, while the person initiating them cannot have a reasonable belief in the existence of the facts on which the proceedings are based if he knows that the alleged facts are not true and his claim is based on false testimony, it is enough if their existence is not

Anderson lacked probable cause to bring criminal charges against J. Mata, the Court looks to the complaint as a whole.  See Fleetwood Retail Corp. v. LeDoux, 142 N.M. at 155-56, 164 P.3d at 37-38.[17]   The Amended Criminal Complaint charged J. Mata with criminal libel, harassment, and stalking.  J. Mata has shown genuine issues of material fact whether Anderson lacked probable cause to bring each of these charges under the Tenth Circuit's standard for probable cause.  The standard for finding a lack of probable cause as asserted by the Supreme Court of New Mexico is similar to the federal standard.  Both are objective standards of reasonable belief.  The Supreme Court of New Mexico has noted that "[b]ecause of the additional requirement of malice in actions for malicious

------

certain but he believes that he can establish their existence to the satisfaction of court and jury.  In a word, the initiator of private civil proceedings need not have the same degree of certainty as to the relevant facts that is required of a private prosecutor of criminal proceedings.

Restatement (Second) of Torts § 675, Comment (d).

[17] The Supreme Court of New Mexico in Fleetwood Retail Corp. v. LeDoux answered the certified question whether, in determining lack of probable cause, trial courts must analyze each claim individually or look to the complaint as a whole.  The Supreme Court stated:

Viewing the certified questions with an eye toward protecting honest litigants, we believe that a court's analysis of probable cause should be undertaken in a manner that will likely have the least chilling effect on a litigant's access to the courts. Accordingly, we conclude that probable cause relates to the complaint as a whole, and the original plaintiff need not show favorable termination of each individual claim to establish an effective defense to a subsequent suit for malicious abuse of process.  It would be too inhibiting of the right to seek redress in court if plaintiffs had to win on every count or be subject to a malicious abuse of process claim for any count that was unsuccessful. See, e.g., Teefey v. Cleaves, 73 S.W.3d 813, 817 (Mo. Ct. App. 2002)("Separate counts in an underlying petition do not support separate actions for malicious prosecution: To allow a party to separate the unsuccessful claims from the successful claims in the underlying proceeding and bring a malicious prosecution action on the unsuccessful ones would invite a multitude of unwarranted litigation . . . ." (quoted authority omitted)).

142 N.M. at 156, 164 P.3d at 38.

abuse of process, we see no contradiction between an objective standard in tort, requiring a reasonable pre-filing inquiry, and a subjective standard under our Rules of Civil Procedure." Devaney v. Thriftway Mktg. Corp., 124 N.M. at 520 n.2, 953 P.2d at 285 n.2.

The Court has analyzed the genuine issues of material fact that J. Mata has shown regarding whether Anderson had probable cause. The same analysis applies here, as both the state standard and federal standard require an objective reasonableness as well as investigation. Viewing the evidence in the light most favorable to J. Mata, the Court finds that the same genuine issues of material fact that exist in the determination of lack of probable cause on J. Mata's federal claims also affect the determination of lack of probable cause in his state-tort claims.

## III.   TENTH CIRCUIT LAW DOES NOT SUPPORT A FINDING THAT PRE-TRIAL RESTRICTIONS CONSTITUTE A SEIZURE FOR PURPOSES OF A FOURTH-AMENDMENT MALICIOUS-PROSECUTION CLAIM.

With regard to J. Mata's Fourth-Amendment malicious-prosecution claim, Anderson argues that, even if J. Mata can establish that Anderson lacked probable cause, he cannot bring a Fourth-Amendment malicious prosecution claim unless he was seized. Anderson contends that the only deprivation of liberty which J. Mata suffered was the necessity of attending his trial and defending against the charges brought against him. In his deposition, however, J. Mata describes the restrictions imposed upon him during his court proceedings, including not leaving the county and not entering an establishment that sells liquor. J. Mata argues that, although he was not arrested, he was placed under restraint of his liberty during the entire pendency of the criminal case because of the restrictions imposed.

In Becker v. Kroll, the Tenth Circuit declined to adopt a continuing-seizure analysis, as articulated by Justice Ginsburg in her concurrence in Albright v. Oliver. See Becker v. Kroll, 494 F.3d at 915 ("Justice Ginsburg's continuing seizure analysis has yet to garner a majority of the

justices of the Supreme Court, and we are not compelled to adopt it."). The Tenth Circuit stated:

"To extend liability in cases without a traditional seizure would expand the notion of seizure beyond

recognition and fall into the trap carefully avoided by the <u>Albright</u> majority -- every charging

decision would support a § 1983 malicious prosecution-type claim no matter the context." <u>Becker</u>

<u>v. Kroll</u>, 494 F.3d at 915. The Tenth Circuit relied upon and quoted from the United States Court

of Appeals for the First Circuit's decision in <u>Nieves v. McSweeney</u>, 241 F.3d 46 (1st Cir. 2001),

which stated:

> [I]f the concept of a seizure is regarded as elastic enough to encompass standard
> conditions of pretrial release, virtually every criminal defendant will be deemed to be
> seized pending the resolution of the charges against him. That would mean, in turn,
> that nearly every malicious prosecution claim could be brought before a federal court
> under the aegis of section 1983.

241 F.3d at 55. The Tenth Circuit held that "[a] groundless charging decision may abuse the

criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant

restriction on liberty." <u>Becker v. Kroll</u>, 494 F.3d at 915. Although the plaintiff in <u>Becker v. Kroll</u>

did not have to post bond, was not required to appear in court, and had no specific restrictions on

her freedom of movement, the Tenth Circuit gave indication that it is nevertheless not inclined to

expand the scope of seizure to include such restraints on liberty. <u>See id.</u> at 916 (suggesting its

reluctance when using the phrase "even if we were inclined to broaden the meaning of seizure

beyond our traditional understanding").

Because the Tenth Circuit has declined to adopt the continuing-seizure analysis, and because

Tenth Circuit precedent suggests that J. Mata must have suffered a traditional seizure, the Court is

reluctant to expand the scope of seizure to encompass standard conditions of pretrial release. <u>See</u>

<u>P.J. v. Utah</u>, 2:05-cv-739, 2008 U.S. Dist. LEXIS 72334, **91-92  (D. Utah Sept. 22, 2008)

(Stewart, J.)(holding that, although court proceedings caused the plaintiffs to suffer financial and

emotional strain and restricted their right to travel, "the Court simply cannot find that they experienced a Fourth Amendment seizure as a result of the Juvenile Court proceedings.  Tenth Circuit precedent clearly mandates the contrary.").   J. Mata concedes that he did not suffer a traditional seizure, and thus the Court finds that J. Mata has failed to establish a Fourth-Amendment violation arising out of the criminal charges brought against him and out of the restrictions imposed upon him during his court proceedings.  The Court, therefore, grants Anderson's motion for summary judgment on the Fourth-Amendment malicious-prosecutions claims, Counts IV, V, and VI in the Second Amended Complaint.

## IV. QUALIFIED IMMUNITY IS NOT APPROPRIATE BECAUSE A REASONABLE JURY COULD FIND THAT AN OBJECTIVELY REASONABLE OFFICER IN ANDERSON'S POSITION WOULD HAVE KNOWN THAT THE CHARGES AGAINST J. MATA WERE INAPPROPRIATE.

Anderson argues that, even if the Court does not find that there was probable cause, the Court should grant summary judgment based on qualified immunity.   Because Anderson has asserted that he is entitled to qualified immunity, the burden shifts to J. Mata to meet the "heavy two-part burden" that the Tenth Circuit has set forth.  See Casey v. W. Las Vegas Indep. Sch. Dist., 472 F.3d at 1327 (quoting Medina v. Cram, 252 F.3d at 1128).  J. Mata must demonstrate that Anderson's actions violated a constitutional or statutory right and, second, that the right at issue was clearly established at the time of Anderson's allegedly unlawful conduct.  See Casey v. W. Las Vegas Indep. Sch. Dist., 472 F.3d at 1327.

Viewing the facts in the light most favorable to J. Mata, the Court finds that, although J. Mata's claims were released by the November 2005 settlement, there is sufficient evidence on the record to support his claims for First-Amendment retaliation.  To establish a First-Amendment retaliation claim against Anderson, J. Mata must plead and prove: (i) that J. Mata was engaged in

-75-

a constitutionally protected activity; (ii) that Anderson's action caused J. Mata to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) that Anderson's action was substantially motivated as a response to J. Mata's exercise of his First Amendment speech rights.  See Worrell v. Henry, 219 F.3d at 1212.  J. Mata also must plead and prove the absence of probable cause for the prosecution.  See Hartman [v. Moore], 126 S.Ct. at 1707.

The Court has determined that J. Mata has brought forth evidence creating a genuine issue of material fact whether there was probable cause for Anderson to bring claims against him.  The Court also finds that the evidence on the record is sufficient to meet the other three elements of J. Mata's claim.  According to the Amended Statement of Probable Cause, Anderson brought criminal claims against J. Mata in part because he filed a citizen complaint along with a petition and because he was picketing the Farmington Police Department.  Both of these actions are constitutionally protected First-Amendment rights, and a reasonable jury could find that Anderson's response of filing criminal charges is enough to chill a person of ordinary firmness from continuing to engage in such activity.  Moreover, Anderson's party admission, as stated in Nagl's affidavit, that J. Mata's "not going to get away with this," viewed in the light most favorable to J. Mata, is sufficient evidence to establish a retaliatory motive.

Because the Court has determined that J. Mata has produced sufficient evidence upon which a reasonable jury could find a violation of a constitutional right, J. Mata must also establish that the right allegedly violated was clearly established at the time so that a reasonable person in Anderson's position would have known that his conduct violated that right.  See Tonkovich v. Kansas Bd. of Regents, 159 F.3d at 516.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority

from other courts must have found the law to be as the plaintiff maintains." Strepka v. Miller, 2001 WL 1475058, at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d at 923). The Tenth Circuit has previously held that First-Amendment retaliation claims are clearly established. See Buck v. City of Albuquerque, 549 F.3d 1269, 1293 (10th Cir. 2008); Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 848 (10th Cir. 2005)("It has long been clearly established that the First Amendment bars retaliation for protected speech and association."). The Court, therefore, finds that J. Mata meets the second-prong of defeating a qualified immunity defense.

Once a plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense ordinarily fails. See Cannon v. City and County of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993). Anderson may nevertheless be entitled to immunity from suit if he can demonstrate that "extraordinary circumstances" intervened and "so 'prevented [him] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of an admittedly clearly established right.'" Cannon v. City and County of Denver, 998 F.2d at 871 (quoting V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality, 902 F.2d 1482, 1488 (10th Cir. 1990)). The extraordinary circumstances exception is most frequently applicable in cases that involve reliance upon counsel. See V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality, 902 F.2d at 1488. The Tenth Circuit has identified four factors that, when applied on a case-by-case basis, help discern when such extraordinary circumstances exist in the context of reliance on counsel: (i) how unequivocal and specifically tailored to the particular facts giving rise to the controversy, the advice was; (ii) whether complete information had been provided to the advising attorney; (iii) the prominence and competence of the attorney; and (iv) how soon after the advice was received the disputed action was taken. See V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality, 902 F.2d at 1489 (citations omitted).

Applying these factors to the circumstances surrounding this case, the Court finds that the extraordinary circumstances exception is not appropriate here.  J. Mata has presented evidence that Anderson requested a book of New Mexico statutes and made an admission that "There's got to be something here. He's not going to get away with this."  See Nagl Aff. ¶ 2.  This evidence cuts against the notion that Anderson acted blindly on reliance upon legal counsel.  There is also a question of the reliability of counsel who provided Anderson with legal advice that turns lawful First Amendment actions, such as picketing, into a criminal charge of harassment.  Anderson has not provided the Court with any information about the prominence or competence of Cooke, the Assistant City Attorney for Farmington with whom Anderson spoke.  The Court finds that Anderson has not demonstrated, as a matter of law, that an extraordinary circumstances exception is warranted here.

Moreover, the Court finds that J. Mata has presented sufficient evidence from which a reasonable jury could determine that a reasonable officer in Anderson's position would not have brought charges against J. Mata based on the information Anderson had and therefore qualified immunity is inappropriate.

## V.    LACK OF NOTICE DOES NOT BAR J. MATA'S STATE TORT CLAIMS, BUT THE TWO-YEAR STATUTE OF LIMITATIONS BARS THEM.

Anderson contends that J. Mata has brought his malicious-abuse-of-process claims under the NMTCA and that he has failed to provide proper notice within ninety days after the occurrence giving rise to the claim, as the NMTCA requires.  Anderson argues that J. Mata should have filed notice of his tort claim of malicious abuse of process no later than April 25, 2005, which is ninety days after his February 1, 2005 arraignment.  Section 41-4-16A requires that a person suing under

the NMTCA provide notice if he or she is seeking damages from "the state or any local public body

. . . ." As the statute states:

> Every person who claims damages from the state or any local public body under the
> Tort Claims Act shall cause to be presented to the risk management division for
> claims against the state, the mayor of the municipality for claims against the
> municipality, the superintendent of the school district for claims against the school
> district, the county clerk of a county for claims against the county, or to the
> administrative head of any other local public body for claims against such local
> public body, within ninety days after an occurrence giving rise to a claim for which
> immunity has been waived under the Tort Claims Act, a written notice stating the
> time, place and circumstances of the loss or injury.

NMSA 1976 § 41-4-16A. According to Boognl, the Claims Manager for the City of Farmington

since January 3, 2005, the City of Farmington never received any Notice pursuant to the NMTCA

from J. Mata, his attorneys, or anyone purporting to act on his behalf in connection with the criminal

charges filed against him in Magistrate Court in January 2005. See Boognl Aff. ¶ 4, at 2. J. Mata

contends that individuals are not entitled to a Tort Claims Notice in New Mexico. See Response

at 8. J. Mata is correct. "The written notice requirements of Section 41-4-16A do not apply to

claims against public employees." Dutton v. McKinley City Bd. of Comm'rs., 113 N.M. at 54, 822

P.2d at 1137. Anderson is a police officer, and while, as an employee of the City of Farmington,

he is entitled to the protections that the NMTCA affords, he is not a "local public body," a

"governmental entity," or the "state or state agency." NMSA 1976 § 41-4-16A. J. Mata's claims,

therefore, are not barred because the City of Farmington did not receive notice of his claim of

malicious abuse of process.

Anderson argues that, even if the notice requirement does not apply, the two-year statute of

limitations bars J. Mata's claims. Anderson contends that the cause of action accrued once J. Mata

learned of the allegedly improper criminal charges filed against him. J. Mata, in his response,

argues that equitable estoppel should toll the statute of limitations because J. Mata did not learn

about Anderson's desire to "get him" until after his criminal case resulted in an acquittal.[18]   In the

hearing, Mr. Montoya stated that the two-year statute of limitations may bar some portion of the

state tort claims but he believes bringing the claims within two years of the acquittal makes them

timely.

Under principles of equitable estoppel, New Mexico law recognizes the doctrine of

fraudulent concealment as a means of tolling a statute of limitations.  See Garcia ex rel. Garcia v.

La Farge, 119 N.M. 532, 893 P.2d 428, 432 (1995).  See also Ballen v. Prudential Bache Sec., Inc.,

23 F.3d 335, 337 (10th Cir. 1994).  A party seeking to toll a statute of limitations through this

doctrine must prove that: (i) the other party engaged in conduct amounting to intentional false

representation or concealment of material facts; (ii) the injured party reasonably relied on the other

party and the concealment was successful; and (iii) the injured party did not know, and through the

exercise of reasonable diligence, could or should not have known the true facts giving rise to a cause

of action.  See Continental Potash, Inc. v. Freeport-McMoran, Inc., 115 N.M. 690, 858 P.2d 66, 74

(1993); Kern ex rel. Kern v. St. Joseph Hosp., Inc., 102 N.M. 452, 697 P.2d 135, 139 (1985).

Although J. Mata argues that did not learn about Anderson's desire to "get him" until after

his criminal case resulted in an acquittal, he has not shown evidence that Anderson made intentional

false representations or concealed material facts of his role in the criminal charges brought against

J. Mata.  J. Mata knew criminal charges were brought against him as soon as he received the

criminal complaint.  Anderson signed the complaint, so J. Mata also knew or should have known,

with an exercise of reasonable diligence, who was responsible for filing criminal charges against

---

[18] The Court notes that this argument is in contradiction to Mr. Montoya's argument that the "greatest telltale sign of malicious intent" and "malicious motive" is Anderson's Statement of Probable Cause bearing Anderson's signature.   Tr. at 25:14-17 (Montoya); id. at 31:19-21 (Montoya).

him.  J. Mata has presented no evidence that Anderson attempted to conceal that he was responsible for bringing criminal charges against J Mata.[19]

The statute-of-limitations analysis, thus, turns on when a malicious-abuse-of-process claim accrues.   A malicious-abuse-of-process claim accrues immediately upon the improper use of process.  See McDow v. Gonzales, No. CIV 07-1266, 2008 U.S. Dist. LEXIS 108674, at *44 n.5; Harvey v. Pincus, 549 F. Supp. at 340.   J. Mata's malicious-abuse-of-process claim accrued when Anderson filed the Amended Criminal Complaint -- February 1, 2005.  Pursuant to the Section 41-4-15A of the NMTCA, J. Mata had two years from that point to file his state tort claims.  J. Mata did not assert his claims of malicious-abuse-of-process until February 2, 2009, in his Second Amended Complaint.[20]   The Court, therefore, finds that J. Mata's state tort claims, in addition to having been released by the November 2005 settlement agreement,  are barred by the statute of limitations.

**IT IS ORDERED** that Defendant Ron Anderson's Motion for Summary Judgment is granted.

_____
UNITED STATES DISTRICT JUDGE

---

[19] Moreover, if, in fact, J. Mata did not suspect Anderson of ulterior motives in bringing a suit against him when the suit was brought, the lack of surprise suggests that perhaps there was probable cause for Anderson's claims.  The Court does not believe that J. Mata intended to make this assertion, and the Court maintains that there are genuine issues of material fact whether there was probable cause.

[20] Even applying the relation-back doctrine to J. Mata's state-tort claims, his original complaint was filed on January 11, 2008, and thus his claims are still time-barred.

*Counsel*:

Dennis W. Montoya
Montoya Law, Inc.
Rio Rancho, New Mexico

     *Attorney for the Plaintiff*

Alex C. Walker
Erin Langenwalter
Lisa Mann
Modrall, Sperling, Roehl, Harris
  & Sisk, P.A.
Albuquerque, New Mexico

     *Attorneys for the Defendant*